# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1251

_____

Henry O. Tyler,                                    *
                                                   *
       Appellant,                           *
                                                   *
                                                   *   Appeal from the United States
    v.                                     *   District Court for the Eastern
                                                   *   District of Arkansas.
University of Arkansas Board                        *
of Trustees; Stephanie Gardner, Dr.,               *
in her official and individual                     *
capacities as Dean of the College of               *
Pharmacy for the University of                     *
Arkansas for Medical Sciences,                     *
                                                   *
       Appellees.                           *

_____

Submitted: September 22, 2010
Filed: January 6, 2011

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

Henry Tyler, an African American assistant dean for diversity at the University of Arkansas, is suing the University and his former supervisor, Dean of the College of Pharmacy Dr. Stephanie Gardner, alleging the school did not hire him for the newly-created position of Director of Recruitment for Diversity in retaliation for the charge of race discrimination he had filed against the school back in 2004. Tyler also alleges that the University discriminated against him on the basis of gender when it

selected a young female with purportedly inferior qualifications, Vivian Flowers, for the coveted spot. Because Tyler's claims are not supported by the required evidence of impermissible motivation behind the University's decision to hire Flowers, we affirm the district court's[1] grant of summary judgment in favor of Tyler's employer.

I

Tyler has been employed at the University of Arkansas for Medical Sciences (UAMS) since 1980. For the first twenty years at the school, Tyler worked as a minority recruitment specialist at the College of Pharmacy (COP); in 2000, he was promoted to Assistant Dean for Diversity for the Center of Diversity Affairs within the same college. In both positions, Tyler was responsible for recruiting minority students to the COP. Along with the College of Medicine (COM), the COP had a particularly dismal record of minority student enrollment and faculty representation out of the UAMS's six colleges.

The present litigation finds its roots in September of 2004, when Tyler sued the University, alleging race discrimination in the University's wage policy and retaliation for his challenge to the policy. The parties settled the lawsuit in October of 2005. The Settlement Agreement fixed Tyler's job duties and elaborated on the University's then-nascent plan to create a campus-wide Office of Diversity, supervised by a single Director of Diversity. One provision in the agreement clarified that the scheme would not in any way disadvantage Tyler:

> The parties understand and agree that UAMS has for some time been exploring the creation of a campus-wide Office of Diversity, to be supervised by a Director of Diversity. The parties further understand and agree that if such Office of Diversity is implemented, it is possible that

---

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

Plaintiff and others at UAMS who currently perform minority recruiting or diversity functions may be transferred from their current colleges or units to the Office of Diversity, may then be directly supervised by the Director of Diversity, and may have their current titles and/or specific job responsibilities appropriately altered. The parties agree that in the event Plaintiff's job position is moved from the College of Pharmacy to an Office of Diversity, this shall have no negative impact on his current salary or benefits.

Appellant App'x at 449.

The plan referenced in the Settlement Agreement was a result of joint efforts by Dean of the COP Dr. Gardner and Dean of the COM Dr. E. Albert Reece to improve their colleges' weak performance on the minority representation front. Both Deans saw a unitary office of diversity comprising all six colleges as a solution to the problem. When the COM began a nationwide search to fill the Director of Recruitment for Diversity spot in 2005, it was looking for a candidate with a Ph.D., experience in recruiting minority students, and a track record of writing grant applications. The search yielded two finalists – Dr. Landefeld and Dr. Brown – with Dr. Landefeld being in the lead based on his strong qualifications and extensive experience in the area. Ultimately, however, the Committee decided against hiring Dr. Landefeld, citing his flamboyant sartorial style in explanation. At that point, the efforts to fill the position stalled.

That is until 2006. At that time, a new dean was installed at one of the colleges and the Search Committee was reassembled. The Committee consisted of the deans of all six colleges (a body referred to as the "Council of Deans"), with Dean Gardner acting as the Committee Chair. By sheer coincidence, around the same time Dean of the College of Health Related Professions Dr. Ronald H. Winters attended his child's high school graduation, where he was impressed by a commencement address given by one Joyce Elliott. Elliott was an African American member of the Arkansas General Assembly and the Legislative Black Caucus, who dedicated her entire career

to issues of diversity in education. Winters thought she would be a perfect fit for the position and relayed his assessment to the Council. Having heard Winters's enthusiastic endorsement of Elliott, Vice Chancellor for Administration and Government Affairs Tom Butler, not a member of the Search Committee, volunteered to contact Elliott to gauge her interest in the job.

While Elliott herself was not interested, she recommended Vivian Flowers as someone who was "eminently qualified" for the job. At the time, Flowers was completing the master's program at the Clinton School of Public Service; in college, she double-majored in political science and rhetoric and writing. Flowers was also involved in various civic organizations: she served as the Executive Director of the Arkansas Legislative Black Caucus, a Commissioner on the Arkansas Minority Health Commission, and a member of the Committee Staff for the Arkansas Bureau of Legislative Research. In addition to her academic bona fides, Flowers had the benefit of a politically-connected family. Her father, Dr. John Flowers, was a physician serving on the UAMS's Minority Advisory Committee, and her cousin, Stephanie Flowers, served in the Arkansas General Assembly along with Elliott.

Following up on Elliott's recommendation, Butler contacted Flowers. Flowers was interested and pursued the opportunity wholeheartedly. After conversing with several UAMS officials on the phone, she had an "informational" meeting with the entire Search Committee on December 20, 2006, before the Committee announced the vacancy publicly. After that meeting, Flowers met with Dr. I. Dodd Wilson, UAMS's Chancellor at the time, and then again with Butler, who alerted her that a formal announcement for the position would be forthcoming. In the days prior to the formal posting, Flowers had her recommenders submit letters on her behalf to Chancellor Wilson, who eventually forwarded them to the Committee. No other candidate was afforded similar privileges prior to the public announcement of the position.

The said public announcement first appeared on the UAMS's website on January 25, 2007. It called for a candidate with a master's degree and three years of experience in public recruiting. A newly-minted graduate, Flowers could not satisfy the latter prerequisite. When the announcement appeared in a print format, however, three years of public recruiting experience was downgraded to a desired qualification, and experience in writing grant applications – Flowers's forte – was added as another desirable skill. The Deans denied any manipulation of the position's description to suit Flowers's qualifications, and a Human Resources Department employee Steven Wood took the blame for what he characterized as the inadvertent mixup in the descriptions.

Flowers submitted her application on the day of the online posting, and was invited for an interview the following day. Tyler submitted his application on February 9, 2007, upon having discovered that the position did not require a terminal degree, as it did during the first search round in 2005. He was interviewed on February 14, 2007, by Dr. Gardner, Executive Associate Dean for Academic Affairs Dr. Richard Wheeler, and Dean of the Graduate School Dr. Robert McGehee. According to the University, the interview did not go well. The Committee viewed Tyler as apathetic and lacking in enthusiasm, and their perception was marred by Tyler's subpar performance as a minority recruitment specialist during his tenure at the COP. Out of the six finalists the Committee interviewed, Tyler was ranked third or fourth, with Flowers and another female candidate, Andi Chappelle, being the two top choices. Although the Committee was concerned about Flowers's lack of recruitment experience, it ultimately selected her for the job. Flowers became Tyler's direct supervisor when she started work in late February of 2007.

After filing a grievance with the Equal Employment Opportunity Commission (EEOC) on the claim of retaliation only, Tyler sued the University and Dr. Gardner, in her individual and official capacities, alleging he was not selected for the Director of Recruitment for Diversity position as a result of gender discrimination and because

the University retaliated against him for filing the discrimination charge in 2004. The complaint stated causes of action under Title VII of the Civil Rights Act and 42 U.S.C. § 1983.

On October 13, 2009, the district court granted summary judgment in favor of both defendants. The court dismissed Tyler's Title VII claim of gender discrimination against the Board because it had not been administratively exhausted. The court dismissed the retaliation claim against the Board because the temporal gap between the alleged protected activity and the retaliatory act was too great, and Tyler had not produced any other evidence of retaliation. Rejecting Tyler's claims against Dr. Gardner, the court concluded his § 1983 retaliation claim was foreclosed by Gardner's qualified immunity and his sex discrimination claim failed because there was never any evidence to show that gender played any role in the Committee's decision to hire Flowers. The present appeal followed.

## II

This court reviews the district court's grant of summary judgment de novo, construing all evidence in the light most favorable to the non-moving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000). Mindful of this standard, we address Tyler's claims of retaliation first and his gender discrimination claims second.

A.    Retaliation

In complaining of retaliation, Tyler proceeds under two theories: violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and deprivation of "rights, privileges, or immunities secured by the Constitution and laws" under 42 U.S.C. § 1983.

Section 704(a) of Title VII makes it unlawful for the employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge" of discrimination against the employer. 42 U.S.C. § 2000e-3(a). In a circumstantial-evidence case like this one, the McDonnell Douglas analytical framework helps the court answer the ultimate question "whether the employer's adverse action against the employee was motivated by retaliatory intent." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir. 2006). As the first step of the framework, the plaintiff must establish a prima facie case of retaliation by showing that "(1) the plaintiff engaged in protected conduct, including opposition to an action prohibited by Title VII; (2) [he] was subjected to an adverse employment action, and (3) there is a 'causal nexus between the protected conduct and the adverse action.'" Lewis v. Heartland Inns of Am., LLC, 591 F.3d 1033, 1042 (8th Cir. 2010) (quoting Wallace, 442 F.3d at 1119). In terms of the causal connection, the plaintiff must show that the protected conduct was a "determinative – not merely motivating – factor in the employer's adverse employment decision." Van Horn v. Best Buy Stores, L.P., 526 F.3d 1144, 1148 (8th Cir. 2008) (internal quotation marks and citation omitted). If the plaintiff succeeds, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the action." Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 550 (8th Cir. 2005). If the defendant does so, the plaintiff can still prevail on a final step of the McDonnell Douglas analysis by proving, by a preponderance of the evidence, that the reasons proffered by the employer are "merely pretext for discrimination." Richmond v. Bd. of Regents of Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992).

Although section 704(a) of Title VII "may not be the basis for a retaliatory discharge claim in a § 1983 action," Greenwood v. Ross, 778 F.2d 448, 455 (8th Cir. 1985), § 1983 provides a vehicle for redressing claims of retaliation on the basis of the First Amendment. Lewis v. Jacks, 486 F.3d 1025, 1028-29 (8th Cir. 2007). "[F]iling of an EEOC charge and a civil rights lawsuit are activities protected by the

first amendment." Greenwood, 778 F.2d at 457. First Amendment retaliation claims are analyzed under the same framework as claims of retaliation under Title VII. Okruhlik v. Univ. of Ark., 395 F.3d 872, 878 (8th Cir. 2005).

### 1.    Prima Facie Case

Tyler's prima facie case fails because he cannot establish a causal nexus between his 2004 suit and the University's decision not to hire him as the Director of Recruitment for Diversity in 2007. That he does not have direct evidence establishing causation is not dispositive: such evidence is seldom available. What is problematic, however, is that Tyler cannot put forward any indirect evidence on this point – such as evidence establishing an inference of retaliatory animus through temporal proximity of the two events. Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 836 (8th Cir. 2007).

Generally, "more than a temporal connection is required to present a genuine factual issue on retaliation," Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005), and only in cases where the temporary proximity is very close can the plaintiff rest on it exclusively. Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1087-88 (8th Cir. 2010). As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation. Sims v. Sauer-Sundstrand Co., 130 F.3d 341, 343 (8th Cir. 1997). The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months. See, e.g., Littleton v. Pilot Travel Ctrs., LLC, 568 F.3d 641, 645 (8th Cir. 2009) (a temporal gap of seven months "not sufficiently contemporaneous" to indicate a causal connection); Recio v. Creighton Univ., 521 F.3d 934, 941 (8th Cir. 2008) (a six-month gap too long to give rise to inference of causal connection); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week

interval was 'sufficient, but barely so.'") (internal citations omitted). In this case, years, let alone months, passed between Tyler's protected activity and the alleged retaliatory act. To be more exact, it was 2 years and 11 months from the time Tyler filed his EEOC complaint in March of 2004 until Flowers was hired in February of 2007. A bit shorter period of time – 15 months – has elapsed since Tyler's case was settled in October of 2005. Given the length of the intervening delay and the absence of other evidence of causation, Tyler cannot rely on temporal proximity to establish a causal nexus.

Tyler attempts to shore up the interrupted causal connection by arguing Dr. Gardner's retaliatory animus manifested itself again when Tyler helped Kimberlee Eason, an African American student at the COP, file a race discrimination grievance against the school in July of 2006. According to Tyler, his assistance to Eason prompted Dr. Gardner to move his office into the Deans suite, allegedly a less student-accessible location where Tyler was under closer scrutiny by Gardner. This argument does not hold water for several reasons. For one, the transfer of Tyler's office into the Deans suite, where offices of all associate and assistant deans were located, was logical given Tyler's title as an assistant dean, and did not exhibit disparate treatment of Tyler. Also, to the extent Tyler asserts his assistance to Eason was a separate protected activity that caused a new instance of retaliation, the move could not be classified as an adverse employment action. At most, it was the kind of a "'petty slight[] or minor annoyance[]'" that does not rise to the level of an adverse employment action. Burkhart v. Am. Railcar Indus., Inc., 603 F.3d 472, 477 (8th Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Finally, there is Tyler's argument that the episode demonstrated Dr. Gardner's continuing hostility for Tyler's exercise of his constitutional rights in 2004. But Tyler does not have any evidence that Dr. Gardner orchestrated the office move and subjected Tyler to heightened scrutiny as a result of his 2004 lawsuit. By the time his office was moved, at least nine months had elapsed since the settlement of Tyler's suit; an even longer period of time passed between the office move and the

University's selection of Flowers in February of 2007. Under this circuit's jurisprudence, the Eason incident does not bridge the temporal gap between Tyler's 2004 lawsuit and the University's 2007 decision to hire Flowers. See Littleton, 568 F.3d at 645 (a seven-month gap not sufficiently contemporaneous to satisfy the causation element of a prima facie case).

Nor is it a case where the employer "took escalating adverse and retaliatory action" against the employee. Heaton v. The Weitz Co., 534 F.3d 882, 888 (8th Cir. 2008). Tyler did not present any evidence indicating the members of the Committee were influenced by his 2004 litigation against the University, in order to bolster his claim of causation. True, the record contains some evidence that the individual members of the Committee were independently aware of the fact of the litigation. But there is no evidence the incident was discussed during the Committee meetings or otherwise tainted the Committee's collective perception of Tyler's candidacy so as to support an inference of gender discrimination. See Nelson v. J.C. Penney Co., 75 F.3d 343, 345 (8th Cir. 1996) (in the absence of evidence that "others who filed age discrimination charges were fired, that [the plaintiff's] supervisors discussed the filing with each other, or that either of them even commented to [the plaintiff] on that filing," the mere knowledge by the supervisors of the plaintiff's charge was not sufficient to support an inference of retaliatory discharge). Absent a more particularized showing that the suit played a role in the Committee's decision to hire Flowers, Tyler's claim of causation is without merit.

2.    Pretext

Even if the Court were to assume Tyler established a causal connection between his 2004 charge of discrimination and the University's refusal to hire him in 2007, he cannot demonstrate that the University's explanation for its preference was pretextual. The University maintains it chose to hire Flowers over Tyler for reasons wholly unrelated to Tyler's litigation history with the school. There are at least two

ways in which Tyler can establish a material question of fact regarding pretext. "A plaintiff may show pretext with evidence that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason – more than the proffered reason – likely motivated the employer." Torgerson v. City of Rochester, 605 F.3d 584, 597 (8th Cir. 2010) (internal citations omitted).

Neither of these two scenarios apply in Tyler's case. The members of the Committee offered a solid, qualifications-driven explanation for their decision to hire Flowers and pass on Tyler. These included Flowers's enthusiasm for the job, the degree of her community involvement and connections, her long-term leadership in the groups dedicated to issues of diversity, her experience in preparing grant applications, and her educational background. Bleak in contrast, there were Tyler's stagnant performance during his more than twenty years at the UAMS and lack of innovative ideas on his part.

The Committee also compared the applicants' performance during the interviews, which they were entitled to do. See Pierce v. Marsh, 859 F.2d 601, 603-04 (8th Cir. 1988). According to the Committee, Flowers presented as an enthusiastic and articulate individual with a vision toward a continuous organized system of minority recruiting; by contrast, Tyler's interview was "lackluster," and he was unable to overcome the taint of his mediocre performance as a minority recruiter within the COP. After holding interviews with six applicants, no member of the Committee ranked Tyler as the first or even second choice, and all but one chose Flowers as the top candidate. In sum, even with the most generous view of Tyler's qualifications, the two candidates had relatively similar qualifications, which does not create a material issue of fact as to pretext. Chock v. Northwest Airlines, Inc., 113 F.3d 861, 864 (8th Cir. 1997).

We also reject Tyler's assertion that a finding of Flowers's preselection – which the record arguably supports – rescues his claim from dismissal. While evidence of preselection and arbitrary manipulation of job requirements to benefit the pre-selected applicant may act to discredit the defendant's proffered explanation, Coble v. Hot Springs Sch. Dist. No. 6, 682 F.2d 721, 728-29 (8th Cir. 1982), revision of the job description is not indicative of pretext where it accurately represents the responsibilities of the job. Dixon v. Pulaski County Special Sch. Dist., 578 F.3d 862, 871 (8th Cir. 2009). It is unclear whether recruitment experience was pivotal for this newly-created position. The Committee was open to modifying the criteria, and did not appear to have any ironclad rules as to the ideal candidate. In fact, the Committee initially relaxed the job description from a Ph.D.-level candidate to a candidate with a master's degree, which benefitted *both* Tyler and Flowers. Even if the court is to credit Tyler's theory that, to accommodate Flowers, the Committee further relaxed the job qualifications to make the recruitment experience merely desirable, we note this decision did not operate to disqualify Tyler.

More critically, however, even if the Committee's proffered reasons were a mere ruse, that ruse did not conceal retaliation. The record is devoid of any evidence that the Committee was motivated at least in part by the desire to retaliate against Tyler for his 2004 legal clash with the University. We have made it clear that "evidence discrediting an employer's nondiscriminatory explanation is not necessarily sufficient" to resist a summary judgment in an employment discrimination case. Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1336 (8th Cir. 1996) (internal quotation marks and citation omitted). At the end of the day, the plaintiff must still advance some evidence indicative of the prohibited discrimination to send the case to a jury. Id.; see also Brandt v. Shop 'n Save Warehouse Foods, Inc., 108 F.3d 935, 938 (8th Cir. 1997) (requiring evidence of intentional discrimination where the plaintiff was rejected in favor of the applicant who took advantage of his "network" to land the job, even though the position was practically tailored to the successful applicant's qualifications). In some cases, evidence that "an employer's proffered

-12-

nondiscriminatory explanation is wholly without merit . . . serve[s] the additional purpose of permitting an inference that . . . discrimination was a motivating factor" in the adverse employment action. Rothmeier, 85 F.3d at 1336 (quoting Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 801 (8th Cir. 1994)) (internal quotation marks omitted). But this is not such a case. The purported "real" reason for rejecting Tyler – preselection of Flowers – is not indicative of retaliation against Tyler. And since none of Tyler's other evidence creates an inference of unlawful retaliation, his retaliation-based claims must fail.

B.      Gender Discrimination

Turning to the second group of claims focusing on gender discrimination, we observe as an initial matter that Tyler failed to exhaust administrative remedies relative to these claims. On the Charge of Discrimination filed with the EEOC, Tyler asserted only discrimination based on retaliation, leaving the sex discrimination box unchecked. As a Title VII plaintiff, Tyler was required to exhaust his administrative remedies with the EEOC before bringing a formal action. Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994). Although Tyler could theoretically clear the exhaustion hurdle by showing his gender discrimination claims were "like or reasonably related to the substance of charges timely brought before the EEOC," id., he may not do so on the facts of this case. According to Tyler's Charge of Discrimination, he was passed over for the Director of Minority Recruitment position and a "less qualified applicant was awarded the job" because the administration wanted "someone fresh and new." Appellant App'x at 311. Tyler alleged further he was "denied promotion in retaliation for filing a charge of discrimination with the EEOC, in violation of Title VII of the Civil Rights Act of 1964, as amended." Id. Nowhere on the Charge does Tyler even mention the gender of the successful applicant, let alone make other allegations indicative of gender discrimination. On these facts – and especially where Tyler's 2004 action dealt with race, and not gender, discrimination – Tyler has not adequately preserved his claims

of retaliatory discrimination.  See Watson v. O'Neill, 365 F.3d 609, 614 (8th Cir. 2004).

The district court held as much with respect to Tyler's gender discrimination claim under Title VII, see Appellant App'x at 765 n.6, and we affirm its conclusion in this regard.  Nevertheless, the court did not discuss exhaustion in the context of Tyler's § 1983 claim, perhaps not realizing exhaustion applies equally to discrimination claims brought under § 1983.  See Foster v. Wyrick, 823 F.2d 218, 221 (8th Cir. 1987) (holding the plaintiff cannot circumvent Title VII's exhaustion requirement by resorting to section 1983 as the vehicle for asserting a Title VII claim).  Since exhaustion is not jurisdictional in nature, Shempert v. Harwick Chemical Corp., 151 F.3d 793, 797-98 (8th Cir. 1998), we, too, consider the merits of Tyler's claim.

Unfortunately for Tyler, his § 1983 gender discrimination claim fares no better on the merits.  Substantive standards for gender discrimination cases brought under Title VII and those brought under § 1983 are the same.  See Tipler v. Douglas County, Neb., 482 F.3d 1023, 1027 (8th Cir. 2007).  Title VII prohibits employers from "refus[ing] to hire . . . any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Discrimination "because of" sex occurs when sex is "a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  Under the applicable McDonnell Douglas framework, the plaintiff must first show "'(1) [he] was a member of the protected group; (2) [he] was qualified to perform the job; (3) [he] suffered an adverse employment action; and (4) circumstances permit an inference of discrimination.'"  Lewis, 591 F.3d at 1038 (quoting Bearden v. Int'l Paper Co., 529 F.3d 828, 831 (8th Cir. 2008)).  The requisite showing creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate nondiscriminatory reason for the action.  Id.  Then, the plaintiff may still demonstrate the employer's proffered reason was pretextual and

-14-

unlawful discrimination was a motivating factor in the adverse employment decision. McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 860-61 (8th Cir. 2009).

Tyler's gender discrimination claim suffers from the same – if not greater – infirmities as his claim of retaliation. First, Tyler cannot establish causation between his gender and the University's refusal to hire. Second, he cannot get past the non-discriminatory explanation offered by the University for its choice. And third, even if nondiscriminatory explanation were a pretext, Tyler has not offered any evidence to suggest the University discriminated against him on the basis of gender.

Pausing briefly on the latter issue, we concede the two top contenders for the job happened to be female. However, because the sample consists of only six applicants, this is not the type of statistical disparity that can support an inference of discriminatory intent. Compare Meyer v. Missouri State Highway Comm'n, 567 F.2d 804, 810 (8th Cir. 1977) (finding intentional sex discrimination where none of the department's 2,000 employees were females), with Eubanks v. Pickens-Bond Constr. Co., 635 F.2d 1341, 1350 (8th Cir. 1980) (ten finishers proved to be too small a sample to infer intentional discrimination from the statistical disparities in promotion of finishers); see generally Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412 (8th Cir. 1975) (stating that "statistical evidence derived from an extremely small universe . . . has little predictive value and must be disregarded"). Moreover, the record shows that six out of the nine members on the COP's Executive Committee were men. Far from supplying the evidence that his gender was a "motivating" factor in the University's decisionmaking, Tyler does not produce a shred of evidence that would tip the scales in favor of finding gender discrimination. Accordingly, the district court did not err in rejecting this claim on the merits.

III

For these reasons, we affirm.

_____

-15-