NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0539n.06

No. 19-1082

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 23, 2019
DEBORAH S. HUNT, Clerk

HARRISON IGWE,

    Plaintiff-Appellant,

v.

SALVATION ARMY,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

---

BEFORE: MOORE, McKEAGUE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Harrison Igwe alleges his former employer, defendant Salvation Army, violated the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964 ("Title VII") when it chose another candidate for a promotion and later terminated his position. Igwe now appeals the district court's grant of summary judgment in favor of the Salvation Army. We affirm.

I.

Harrison Igwe, Ph.D is an African American man of Nigerian origin who was 63 years old at the time of his discharge. Dr. Igwe began working for the Salvation Army in 1985 and joined the Southeast Michigan Salvation Army Rehabilitation Center (the "Detroit ARC") as its Director of Rehabilitation Services ("DRS") in 2003, where he was responsible for client intake and counseling. Then, in 2006, the Salvation Army restructured the Detroit ARC, and Plaintiff's job

title changed from DRS to "Director of Programs"[1] because another employee assumed responsibility for client intake.

Things changed in 2016, when Larry Manzella became the Detroit ARC's administrator. Like plaintiff, Manzella has a long history with the Salvation Army. He served as the administrator for several Salvation Army rehabilitation centers prior to overseeing the Detroit ARC. When Manzella began supervising the Detroit ARC, he found "multiple problems throughout the facility." One such problem was that "the [Detroit ARC] had evolved into silos," so employees and departments were not communicating with each other. Manzella also found Dr. Igwe to be ineffective because he was "[n]ot supervising, decisions were not going through him, [and] counselors were doing their own thing . . . . Just chaos, disorganization, miscommunication." Manzella specifically took issue with Dr. Igwe's communication skills:

> Communication was terrible. I'll just say it right out. When you ask somebody a question, you're looking for some type of response, whether it's positive or negative, something. Conversations with Dr. Igwe were one-sided. They were yes, okay, yes. Trying to get information from him was very difficult. I'll give you an example. We have a board meeting and we have all the directors sitting around the table and one by one they give their report, extensive reports about what's going on in their department. When it comes to Dr. Igwe, what's happening with your program? Silence. It's good. It's good. The numbers are coming down, can you explain why? Gets up, runs out of the room, goes and get[s] somebody to come back and answer the question. There is nothing there. No response, conversation after conversation. It's just the way it was.

Because of the issues he observed, Manzella made structural changes to the Detroit ARC. One of the major changes he instituted was hiring a DRS who would assume responsibility over both the programs department (overseen by Dr. Igwe) and the housing department (overseen by another employee). Manzella made the change to return the Detroit ARC to compliance with

---

[1]This position is also referred to in the record as the Director of Program Services or the Program Director.

national Salvation Army policy. He also thought it would help solve the communication breakdowns he observed. Accordingly, Manzella posted the DRS position online and solicited applications from internal candidates.

On December 22, 2016, Dr. Igwe met with Manzella to discuss the DRS position. Manzella wrote to his supervisors that the meeting "went very well[,]" and that he had "invited [Dr. Igwe] to apply for any position he was comfortable with." Plaintiff admits that Manzella also informed him that the Director of Programs position was being terminated as part of the restructuring. After the meeting, Dr. Igwe applied for the DRS position, but no others.

But by then, Manzella was already focused on his preferred candidate for the DRS position. In mid-December, he wrote to his superiors to ask whether the Salvation Army's requirement that the DRS possess a master's degree was "absolute." He explained that he had a candidate named Lynne Williams "in mind" for the position, but that she did not hold a master's degree. Manzella's superiors responded that he could consider candidates with bachelor's degrees, but also expressed concern that he might be "limit[ing]" himself by not "cast[ing] a wider net for potential candidates."

Williams is a Caucasian woman. At the time, she was 56 years old and was employed as the assistant director of spirituality for the women's campus at the Detroit ARC. She possessed only a bachelor's degree but had 15 years of high-level management experience outside of the Salvation Army. Williams was also a felon because of a struggle with drug addiction in the mid-2000s. However, she "got clean" in 2010 and viewed her experience with recovery as an asset in her counseling work.

The hiring process moved relatively quickly. Williams had a preliminary interview with Manzella and advanced to a second interview with Manzella and his supervisor, Charlene Polsley.

After the second interview, Manzella emailed a summary to his supervisors. He wrote that Williams' "[p]ositives" included that she "contribute[d] in [d]iscussions [with] good insight" and had shown the "necessary leadership skills" in her role at the time. As for concerns, Manzella noted that Williams lacked a master's degree and did not seem confident during the interview.

Manzella and Polsley also scheduled an interview with Dr. Igwe (having skipped the preliminary stage). Before Dr. Igwe's interview, Manzella documented his thoughts on Dr. Igwe's application. On the one hand, Manzella wrote, "it would appear he is far and away the most qualified candidate for the new position of DRS. He has years of faithful service as our Program Director along with a strong academic background. He is also a very likeable person who I believe wants to do well." But on the other hand, Manzella wrote that Dr. Igwe "lack[ed] one very important characteristic[:] . . . [L]eadership." He explained that with Dr. Igwe, "[t]hings tend to happen around him rather than moving thru [sic] him. If there is a conflict with one of his staff he generally disappears rather than stepping in to take charge. When confronted at a meeting with a question he ran out the door to find someone else that could answer my question. His broken speech has also made it difficult to communicate with him at times." All in all, Manzella concluded that "[i]n a different position, Dr. [Igwe] . . . would do very well[,]" but he had "serious concerns about his assuming the role of DRS . . . ."

Dr. Igwe then interviewed with Manzella and Polsley. According to Polsley, Dr. Igwe did not interview well because he could not explain how he would handle conflicts among employees and did not provide substantive answers to questions about the Salvation Army's residential program. Dr. Igwe claims that Polsley asked whether he was a U.S. citizen or if he had a green card during the interview.

Ultimately, the Salvation Army hired Williams. Manzella announced the decision in a staff meeting on January 27, 2017. At the same time, he declared that anyone working in the counseling department would be required to interview for a position with Williams. Apparently in reference to this requirement, Manzella told the gathered employees that they "should behave as slaves and obey their master like Christ." Manzella says that he was reading from a daily devotional based in part on a Bible verse.[2] Dr. Igwe testified that he was not familiar with nor did he understand Manzella to be reciting the particular Bible verse.

After Williams was promoted, plaintiff's job security was in jeopardy. Nevertheless, he made a "personal decision" not to report to Williams because he still considered her a "subordinate" who was unqualified for the DRS position. He therefore refused to interview for any other position within the purview of the DRS, even with the knowledge that his position would be eliminated. According to Manzella, once Williams received the DRS position, Dr. Igwe's "attitude went south[,]" and he "refused to cooperate" with the restructuring. This led to two formal "Warning Notices" for refusing to copy Williams on email. It also led to Dr. Igwe's suspension, which cited both the elimination of the Director of Programs position and his refusal to interview with Williams for the other open positions. Finally, defendant fired plaintiff on March 1, 2017, listing the elimination of his position as the reason.

Plaintiff filed this suit in the United States District Court for the Eastern District of Michigan, alleging two counts of unlawful discrimination under Title VII (based on his race and

---

[2] The Bible verse in question, 1 Corinthians 7:22, reads, "And remember, if you were a slave when the Lord called you, you are now free in the Lord. And if you were free when the Lord called you, you are now a slave of Christ." Dr. Igwe alternatively recalled Manzella as saying "slaves, obey your masters just like Christ did."

national origin) and one count of unlawful age discrimination in violation of the ADEA. After discovery, defendant moved for summary judgment under Federal Rule of Civil Procedure 56(a).

The district court granted the motion and dismissed the case in its entirety. It concluded that Dr. Igwe satisfied his prima facie case for his race and national origin discrimination claims, but that the Salvation Army had presented a legitimate, nondiscriminatory reason for not offering him the DRS position and for discharging him, and that Dr. Igwe had not presented sufficient evidence of pretext to warrant submission of the case to a jury. On plaintiff's ADEA claim, the court found that Dr. Igwe could not make out a prima facie case of age discrimination because he relied solely on the seven-year age difference between himself and Williams. Dr. Igwe now appeals the judgment entered in favor of the Salvation Army.

## II.

We review the district court's summary judgment determination de novo. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is genuinely in dispute if a reasonable factfinder could resolve it either way. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the disputed issue of fact is material to liability, therefore, premature entry of summary judgment inappropriately supplants the role of the factfinder in adjudicating liability. *See id.* at 248–49. Denial of summary judgment where there is no genuine dispute of material fact, on the other hand, improperly permits a claim to go to the factfinder even though there can be only one possible outcome. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson*, 477 U.S. at 250–52. In determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law," the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 251–55. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012) (quotation marks omitted).

### III.

Title VII of the Civil Rights Act of 1964 makes it unlawful to "fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, . . . or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). The ADEA extends identically worded protection to employees from age discrimination. *See* 29 U.S.C. § 623(a)(1). Dr. Igwe's claims implicate both the "refuse to hire" and the "discharge" provisions of each act. He contends that the Salvation Army refused to hire him for the DRS position and then discharged him because of his age, race, and national origin.

### A.

As a preliminary matter, Dr. Igwe has forfeited review of his ADEA claim. He says that the Salvation Army "does not contest" that he made a prima facie case of discrimination on each of his claims, so the only issue here is pretext. But this is true only of his Title VII claims, and more importantly, the district court ruled that plaintiff failed to make out a prima facie case of age discrimination. Because Dr. Igwe does not address that ruling on appeal, he has forfeited the issue. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310–11 (6th Cir. 2005).

In addition, even if there was no forfeiture, the district court properly granted summary judgment in favor of defendant because Dr. Igwe relied entirely on the seven-year age difference between himself and Williams, which we have held to be generally insufficient to make out a

prima facie case of age discrimination. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336–40 (6th Cir. 2003); *see also Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 467 (6th Cir. 2014) (affirming summary judgment on age discrimination claim premised upon seven-year age difference).

B.

We turn next to Dr. Igwe's claims under Title VII. Dr. Igwe contends that he presented direct and circumstantial evidence that required submission of his claims to a jury. We disagree.

1.

Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated, at least in part, by unlawful discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). In other words, direct evidence "is proof that . . . compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) (internal quotations and citations omitted). "Isolated and ambiguous comments are insufficient to support a finding of direct discrimination." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005). The evidence proffered by Dr. Igwe does not meet these standards.

Dr. Igwe first points to Manzella's passing observation that Igwe's "broken speech . . . made it difficult to communicate," and contends that this observation constitutes direct evidence of national origin discrimination. To be sure, statements suggesting an employer failed to hire a person because of their foreign accent or speech pattern can constitute direct evidence of national origin discrimination. *See, e.g.*, *In re Rodriguez*, 487 F.3d 1001, 1005–06, 08–09 (6th Cir. 2007) (employer told colleague he would have promoted the Hispanic plaintiff "but for" the plaintiff's

"Hispanic speech pattern and accent"). But Manzella's "broken speech" remark was nothing more than an "isolated and ambiguous comment," *White*, 429 F.3d at 239, unreflective of the broader communication and leadership difficulties that led Manzella to choose Williams over Dr. Igwe for the DRS position. Plaintiff also highlights Polsley's green card/citizen question. But this likewise does not lead to an unmistakable intent to discriminate upon national origin. *White*, 429 F.3d at 239; *see also Norbutta v. Loctite Corp.*, 1 F. App'x 305, 311 (6th Cir. 2001) ("Title VII does not bar discrimination based on citizenship or residency." (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88–90 (1973); 42 U.S.C. § 2000e-2(a)(1)). Finally, the fact that four other African American employees were discharged and that a Caucasian department head was not disciplined for alleged communication issues is not direct evidence of unlawful discrimination. Accordingly, the district court properly concluded that plaintiff did not proffer direct evidence of discrimination in support of his Title VII claims.

2.

In the alternative, Dr. Igwe argues that the circumstantial evidence he presented was sufficient to avoid summary judgment under the familiar *McDonnell Douglas* burden-shifting framework. *First*, the plaintiff must establish a prima facie case of discrimination; *second*, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action; and *third*, the plaintiff must demonstrate that the stated justification is merely pretext. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). Here, the parties focus on pretext, so we assume that Dr. Igwe made out a prima facie case of discrimination on his Title VII claims.

Dr. Igwe may demonstrate pretext by showing that the stated reason for the adverse action: (1) had no basis in fact, (2) was not the actual reason for the termination, or (3) was insufficient to

explain it. *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). "[A] reason cannot be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger*, 681 F.3d at 285 (alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Thus, regardless of which rebuttal method a plaintiff uses, "he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *Id.* at 285 (alterations and quotations omitted).

a.

The Salvation Army asserted that Dr. Igwe's poor performance justified hiring another candidate for the DRS position. This rationale is amply supported by the record. Therefore, the issue is whether Dr. Igwe produced evidence from which the factfinder could reasonably infer that the asserted unlawful discrimination was the real reason he was not hired as the DRS, and not his alleged performance issues. *See id.*

Dr. Igwe first attempts to show pretext by arguing that he was more qualified for the DRS position than Williams because he has superior educational credentials. But the fact that Dr. Igwe's educational credentials exceeded those of Williams does not require submission of his claims to a jury. As we have long held, "[s]o long as its reasons are not discriminatory, an employer is free to choose among qualified candidates[]" when making hiring decisions. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). When an employer acts to fill a management-level opening, it has even greater flexibility because of the nature of the position. *Id.* Nevertheless, relative qualifications may "establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not

better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815–16 (6th Cir. 2011) (internal quotations omitted).

Here, Dr. Igwe fails to demonstrate that he was a plainly superior candidate because it was his performance—and not his educational credentials—that led Manzella to prefer Williams for the position. As Manzella put it, "[n]obody is arguing his qualifications. It's . . . what he did in the position, that's the crux of this." Manzella explained to his superiors at Salvation Army headquarters that Williams was a strong candidate because he had observed that, among other things, she had the "necessary leadership skills" and offered "good insights" during group discussions—the very skills Manzella found lacking in Dr. Igwe. Williams also possessed extensive managing experience outside the Salvation Army, which made her an attractive candidate to Manzella. Under these circumstances, Dr. Igwe has not established that he "was a plainly superior candidate, such that no reasonable employer would have chosen" Williams over him. *Id.*

Dr. Igwe could also show that he was as qualified, if not better qualified than Williams, along with "other probative evidence of discrimination." *Id.* at 816. No such record evidence exists.

The only potential evidence of race discrimination proffered by Dr. Igwe is Manzella's reference to "slave" or "slaves" as part of a daily devotional he gave at a staff meeting.[3] But in this context, a Biblical reading is not probative evidence of intentional discrimination.

---

[3] Dr. Igwe did not sufficiently develop the facts to assess the circumstances of other African American employees who were discharged or to conclude that a Caucasian department manager was similarly situated to pursue a disparate treatment theory of discrimination. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

The Salvation Army is "a Christian, faith-based organization." Dr. Igwe testified that he was not aware that Manzella's message came from a Bible verse. No reasonable juror could find, based on this incident, that the real reason Dr. Igwe did not receive the DRS position was his race.

Dr. Igwe relies on Manzella's reference to his "broken speech" and the alleged questioning by Charlene Polsley about his citizenship to support his claim of national origin discrimination. First, Manzella's comment about Dr. Igwe's broken speech could not lead a reasonable juror to reject the Salvation Army's explanation for not hiring him. To be sure, accents and speech patterns are closely tied to national origin. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991) (citing *Berke v. Ohio Dep't of Pub. Welfare*, 628 F.3d 980, 981 (6th Cir. 1981)) *abrogated on unrelated grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). But "[u]nlawful discrimination does not occur . . . when a plaintiff's accent affects his ability to perform the job effectively." *Id.* (citing *Fragante v. Honolulu*, 888 F.2d 591 (9th Cir. 1989)). Here, there is no dispute that Manzella viewed Dr. Igwe's communication skills—whether related to his national origin or not—to inhibit his ability to perform the duties of the DRS.

Polsley's questioning of Dr. Igwe does not change this result either. Title VII prohibits discrimination in employment based on national origin, which "refers to the country where a person was born, or . . . the country where his or her ancestors came from." *Espinoza*, 414 U.S. at 88. It is not to be conflated with alienage or citizenship. *See id* at 88 n.2 ("[T]he term 'national origin' does not embrace a requirement of United States citizenship."); *see also Douglas v. Eaton Corp.*, 577 F. App'x 520, 526 (6th Cir. 2014); *Noburta v. Loctite Corp.*, 1 F. App'x 305, 311 (6th Cir. 2001). The sole question at issue—whether Dr. Igwe was a citizen or had a green card—cannot be considered probative evidence of national origin discrimination for this reason.

In sum, plaintiff has not presented circumstantial evidence establishing that defendant's legitimate, nondiscriminatory justification for declining to hire him as the DRS for the Detroit ARC was pretextual. The district court properly granted summary judgment on this portion of plaintiff's claims.

b.

Moving now to the discharge portion of plaintiff's claims, Dr. Igwe's primary contention is that the reason given for his discharge—his position being eliminated—has no basis in fact. He premises this argument on the grounds that he was listed as the DRS in his personnel file, had allegedly always handled the responsibilities of a DRS, and was identified as the DRS by the sign outside his office door. Therefore, he claims that his position was not actually eliminated.

We disagree. Within the Salvation Army command structure, the DRS was responsible for overseeing the housing department as well as the counseling department. Dr. Igwe did not oversee the housing department. He also agreed that the DRS position he interviewed for (which Williams received) was different than the job he held until his discharge because of the divergent responsibilities. Thus, contrary to Dr. Igwe's later claims, the record demonstrates that the Salvation Army eliminated the Director of Programs—just as it eliminated the Director of Housing—through its restructuring.

Plaintiff also briefly argues that his discharge was not actually motivated by the cited justification because the reason given for his termination was "a moving target." But Dr. Igwe conceded that once Williams was selected to fill the DRS position, he *knew* that the Director of Programs position would be eliminated. And despite this knowledge, he *refused* to interview for any other position because he believed Williams was not qualified to be his supervisor. Based on these undisputed facts, Dr. Igwe has not proffered evidence which could lead a reasonable juror to

conclude that his discharge was not actually motivated by the restructuring of the Detroit ARC and the elimination of the Director of Programs position. Accordingly, we conclude that the district court correctly granted summary judgment on Dr. Igwe's Title VII discharge claims.

## IV.

For these reasons, we affirm the judgment of the district court.