# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2901

_____

Toni Bone,                                      *
                                                *
        Appellant,                    *
                                                *
   v.                                       *   Appeal from the United States
                                                *   District Court for the
G4S Youth Services, LLC;                         *   Eastern District of Arkansas.
Todd Speight,                                   *
                                                *
        Appellees.                    *

_____

Submitted: June 13, 2012
Filed: July 30, 2012

_____

Before LOKEN, GRUENDER, and BENTON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Toni Bone appeals the district court's[1] grant of summary judgment in favor of her employer, G4S Youth Services, LLC ("G4S"), and her supervisor, Todd Speight, on Bone's claims that they terminated her employment based on her race, age, and use of family medical leave. For the reasons that follow, we affirm.

---

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

## I.  BACKGROUND

G4S began operating the Alexander Juvenile Assessment and Treatment Center ("AJATC"), a youth detention center, in January 2007 under a contract with the Arkansas Department of Human Services Division of Youth Services ("DYS"). G4S hired Toni Bone in March 2007 as the education director at AJATC. Before she was hired, Bone was interviewed by G4S's chief executive officer, Kerry Knott, G4S's head of education, Jerry Neely, and G4S's facility director for AJATC, Todd Speight. Bone, like Knott and Neely, is Caucasian and was older than forty when she was hired. Before coming to G4S, Bone was the special education supervisor at DYS. In that position, she oversaw special education at six of the eleven juvenile detention facilities in Arkansas, including AJATC. One of her responsibilities at DYS was to oversee compliance with a Corrective Action Plan ("CAP") created pursuant to a settlement agreement between DYS and the United States Department of Justice. Once at G4S, Bone worked under Neely to set up an education program at AJATC that complied with the CAP, but she also reported directly to Speight.

It is undisputed that Bone was a valued employee for the first seven months of her employment with G4S. She had a positive working relationship with both Neely and Speight. In October 2007, Bone received a positive performance review from Speight, obtaining a rating of 3.7 out of 4. AJATC achieved several educational goals during this time, and Bone received praise from G4S and DYS for the progress. During this time, no one from DYS came to AJATC to oversee or monitor the special education program at AJATC. In November 2007, DYS hired Valecia Pumphrey as its education director and Mary Steele as Bone's successor as special education supervisor. Like Bone before her, Steele was charged with overseeing compliance with the CAP. Soon thereafter, Steele began to visit AJATC and monitor Bone's progress with the special education program. Bone previously had been Steele's supervisor when they both worked in the Little Rock School District. Pumphrey and Steele quickly experienced problems communicating with Bone.

According to Pumphrey and Steele, Bone told them in regulatory meetings in November 2007, December 2007, and January 2008 that all teachers at AJATC had received "due process training" in August 2007 as required by the CAP. Steele relayed this information to state officials at the Arkansas Department of Education ("ADE"). These officials requested documentation to confirm the training, and Bone promised to provide it to Steele. After Bone failed to provide the documentation, Steele contacted the training provider and determined that only one teacher received the training required by the CAP. Steele testified that she felt like Bone was telling her what Bone thought Steele wanted to hear instead of the truth, causing Steele to lose trust in Bone. Steele notified Speight and Neely that she had provided false information to ADE officials in reliance on Bone's representations. G4S placed Bone on paid administrative leave while it investigated Steele's accusation. In her deposition, Bone testified that she never told Steele that all teachers had been trained but merely told her that all teachers *who were available that day* had been trained. Bone claimed that her statement was true because only one teacher was available that day. G4S indicated that it would have suspended or terminated Bone if it had determined that she lied to Steele regarding the CAP training, but it never made such a determination.

Shortly thereafter, G4S created a new special education supervisor position separate from that of education director. Speight asked Bone whether she wanted to continue as education director or as special education supervisor. Bone chose the special education supervisor position because that was her area of expertise. The change became effective on February 3, 2008. Although Bone was no longer responsible for the entire educational program at AJATC, her salary remained the same. G4S hired Dr. William Thomas, a seventy-three-year-old African-American man, to fill the education director position. Dr. Thomas had twenty-five years of experience as a school superintendent and received a higher salary than Bone.

In March 2008, Bone underwent shoulder surgery while on paid leave for spring break. She took additional paid leave the following week to recover. According to Bone, Speight was wonderful to her regarding the surgery, he gave her advice based on his experience with the same surgery, and G4S even sent her flowers. Bone's doctor cleared her to return to work on April 1, 2008 with the restriction that she could not use her right arm. Bone emailed Speight to inform him that she could not be hit or bumped in the shoulder. One day after she returned to work, G4S required Bone to substitute temporarily for an absent teacher.

Steele at DYS continued to have problems with Bone after Bone's responsibilities were limited to special education. Steele testified that Bone repeatedly refused Steele's requests and resisted making any changes. On April 10, 2008, ADE officials informed Steele that the parental rights of the mother of an AJATC student had been terminated. Steele instructed Bone to appoint a surrogate parent for the student. Bone responded that she could not comply without a copy of the court's parental-rights termination order. Steele instructed Bone not to hold a special education conference for the student until Steele could obtain a copy of the termination order and appoint a surrogate parent. Three days later with no surrogate parent appointed, Bone conducted a special education conference for the student despite Steele's instructions. Steele reported her concerns about Bone to G4S. On May 7, 2008, Knott met with Bone and Speight. Knott gave Bone the option to resign in lieu of her employment being terminated. Bone signed a letter of resignation that day. G4S hired Misty Hunt, a forty-two-year-old Caucasian woman, to replace Bone.

Bone filed a complaint in September 2008 with the Equal Employment Opportunity Commission ("EEOC") and later received a right-to-sue letter. In August 2009, Bone brought this lawsuit against G4S, Speight, Steele, Pumphrey, and DYS. Bone alleged that she was terminated based on her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and in violation of the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-101 *et seq.* She also

alleged that the termination was based on her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, in retaliation for engaging in protected speech in violation of 42 U.S.C. § 1983 and ACRA, and in violation of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* After the close of discovery, the district court granted the defendants' motions for summary judgment on all counts. The court concluded that Bone had not established pretext in the race and age claims, that Bone had not engaged in protected speech, and that Bone did not establish that G4S interfered with or retaliated against Bone's exercise of her FMLA rights. Bone appeals solely the grant of summary judgment in favor of G4S and Speight, and solely on her race, age, and FMLA claims.

## II. DISCUSSION

Bone contends that the district court erred in granting summary judgment because she provided direct evidence of race and age discrimination and, alternatively, demonstrated that G4S's legitimate, non-discriminatory reason for terminating her employment was merely a pretext for intentional discrimination on the basis of race and age. She also contends that the district court erroneously granted summary judgment on her FMLA claims. We review the district court's grant of summary judgment *de novo*. *Taylor v. St. Louis Cnty. Bd. of Election Comm'rs*, 625 F.3d 1025, 1026 (8th Cir. 2010) (per curiam). "Summary judgment is appropriate where, viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* "There is no 'discrimination case exception' to the application of summary judgment . . . ." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

Bone can survive summary judgment on her race and age discrimination claims either by providing direct evidence of discrimination or by creating an inference of

unlawful discrimination through the *McDonnell Douglas*[2] analysis. *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012) ("Similar to claims of race discrimination, when a plaintiff 'has no direct evidence of [age] discrimination, his claims are analyzed under the familiar burden-shifting scheme of *McDonnell Douglas Corp*. . . . .'" (quoting *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011))). "We also note that we analyze [Bone's] Title VII and Arkansas Civil Rights Act claims under the same standards." *Id.* at 853.

## A.      Direct Evidence of Age and Race Discrimination

We have previously said that "[d]irect evidence in this context is not the converse of circumstantial evidence . . . [but] is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Torgerson*, 643 F.3d at 1044 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Such evidence must be "strong" and must "clearly point[] to the presence of an illegal motive" for the adverse action. *Griffith*, 387 F.3d at 736.

Bone contends that she presented direct evidence of age and race discrimination in the form of a remark that she says Pumphrey, a DYS employee, made in the presence of Knott and Speight, her superiors at G4S, six months prior to the termination of her employment. Although Bone was no longer an employee of the State of Arkansas, she attended a weekend job fair as a "volunteer effort" on ADE's behalf without the approval of DYS or G4S. Knott and Speight convened a meeting to instruct Bone not to attend recruiting events without approval. Pumphrey was present at the meeting and, according to Bone, said "that she did not want an old white lady in a suit doing recruiting." According to Bone, Speight made "a cocky

---

[2]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

smile to the corner" of his mouth when Pumphrey made the comment and neither Knott nor Speight answered when Bone asked in relation to the comment, "Is that appropriate?" Bone testified in deposition that she then asked whether they wanted someone like "Ms. Smith," whom Bone identifies as an African-American who is not a teacher, and that Pumphrey responded affirmatively. Bone contends that Pumphrey's comments were made in the context of employment decisions and that Speight's and Knott's tolerance of them is thus direct evidence of their discriminatory intent in terminating her employment.

Contrary to Bone's arguments, Speight's reaction and Knott's lack of reaction to Pumphrey's comments are not direct evidence of a discriminatory motive for firing Bone. Knott and Speight merely failed to respond when a representative of their facility's sole client made inappropriate "stray remarks in the workplace" that were "unrelated to the decisional process" of terminating Bone's employment. *See Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993) (quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991)). Furthermore, Pumphrey's comments were made six months before G4S decided to discharge Bone. The gap in time and lack of connection between Pumphrey's comments regarding recruiting and G4S's decision to discharge Bone negate Bone's arguments that Speight's and Knott's reactions constitute direct evidence of G4S's discriminatory motive for her discharge. *See Ramlet v. E.F. Johnson*, 507 F.3d 1149, 1153 (8th Cir. 2007) (holding that comments made more than four months prior to the adverse employment action were not connected to the decision-making process and, therefore, were not direct evidence of discrimination). Thus, to succeed on her race and age discrimination claims, Bone must create an inference of unlawful discrimination through the *McDonnell Douglas* framework. *Torgerson*, 643 F.3d at 1044.

### B.     Pretext for Age and Race Discrimination

Assuming, without deciding, that Bone presented a *prima facie* case of race and age discrimination, *see Elam v. Regions Fin. Corp.*, 601 F.3d 873, 879 (8th Cir. 2010), G4S had the burden to articulate a "non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).  This burden is not onerous, *id.* at 853, and G4S satisfied it by stating that it discharged Bone for failing to follow Steele's directive not to hold the special education conference without appointing a surrogate parent, miscommunicating with Steele and Pumphrey regarding the teacher training, losing the trust of DYS employees as a result, and refusing in general to make changes to accommodate the requests of DYS employees.

Bone contends that G4S failed to articulate a legitimate reason for terminating her employment because there are unresolved fact questions as to whether Bone actually lied to Steele and Pumphrey regarding the teacher training or whether a surrogate parent could be appointed before a copy of the parental rights termination had been obtained.  However, we do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Id.* at 854 (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). So long as G4S had a "good faith" basis for discharging Bone, it does not matter whether Bone actually lied to Steele regarding the teacher training or whether a surrogate parent truly could be appointed before a copy of the parental rights termination was obtained. *See Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 811 (8th Cir. 2005); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004).  There is no genuine issue of fact as to whether DYS employees made false reports to ADE officials based on Bone's description of the teacher training, that Bone disobeyed Steele's directive regarding the special education conferences, and that Steele

experienced a general dissatisfaction with and loss of trust in Bone. These repeated complaints regarding Bone's response to legitimate customer concerns constitute a "good faith" basis for G4S's decision to terminate Bone's employment.

Because G4S articulated a legitimate, non-discriminatory justification for discharging Bone, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005). The plaintiff has the burden of persuasion at all times. *Id.* Bone's burden to show a genuine issue of material fact regarding pretext "merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination." *Torgerson*, 643 F.3d at 1046 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993) ("[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."); *Rothmeier v. Inv. Advisors, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996) (noting that a plaintiff in an ADEA suit must both (1) create a fact issue as to whether the employer's reasons for the discharge are pretextual and (2) create a reasonable inference that the plaintiff's age was a determinative factor in the discharge). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact" as to whether the termination was motivated by intentional discrimination. *Torgerson*, 643 F.3d at 1046. Bone contends that she established pretext and created a reasonable inference that her discharge was motivated by intentional discrimination because she identified nineteen young, African-American employees whom G4S allegedly treated more favorably than her in disciplinary matters, G4S's explanation for her termination shifted over time, and she identified other incidents of racial discrimination. We address each argument in turn.

*1. Comparators*

Bone provided evidence that G4S subjected nineteen youth care workers to "progressive discipline" and contends that, although similarly situated to the youth care workers, she was not treated similarly to them because of her age and race. G4S cited the youth care workers for disciplinary problems ranging from minor violations, such as dress code and attendance problems, to critical violations, such as sleeping or leaving a duty station during a shift or fighting with a resident. Under G4S's "progressive discipline" system, perpetrators of minor violations do not merit termination unless they repeatedly misbehave despite prior warnings. In contrast, critical violations could, but need not, result in a suspension or even termination for the first offense. Bone points out that several African-American youth care workers received one or more suspensions for critical violations before being discharged. Bone contends that she demonstrated that G4S's reasons for terminating her employment were merely a pretext for intentional discrimination because she never received progressive discipline before she was discharged.

At the pretext stage, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Rodgers*, 417 F.3d at 853. Bone must show that she and the employees outside of her protected group were "similarly situated in all relevant respects." *Id.* "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). Furthermore, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Rodgers*, 417 F.3d at 853 (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972-93 (8th Cir. 1994)) (internal quotation marks omitted).

The nineteen youth care workers are not valid comparators because they had different immediate supervisors from Bone and did not engage in the same conduct

as Bone. Although Speight as facility director ultimately approved their terminations, he was not the direct supervisor for the youth care workers. Various supervisors handled their progressive discipline and ultimately recommended their dismissals; Speight merely approved the recommendations. In contrast, Speight was Bone's direct supervisor and conducted her performance review. Moreover, Knott, not Speight, made the actual decision to discharge Bone. Unlike the youth care workers, who were relatively junior employees, Bone was an administrator who worked directly with Speight and Knott, and the decision to terminate her employment was not merely ratified by upper management, but was made by Knott, the chief executive officer, in the first instance. Furthermore, Bone did not engage in the same conduct as the comparators "without any mitigating" differences. *Clark*, 218 F.3d at 918. Unlike any of the youth care workers, only Bone was accused of resisting the directives of employees at DYS, AJATC's sole client. Bone's resistance to DYS directives and outright refusal to comply with Steele's request regarding the special education conference is different in kind from the youth care workers' various disciplinary violations. In short, Bone has failed to establish that the youth care workers are similar to her in "all relevant respects." *See Rodgers*, 417 F.3d at 853.[3]

Bone also contends that Speight and another employee, Dr. Darrin Kirkendall, were not disciplined at all for a disciplinary violation that was even more serious than her violation, releasing without proper notice a youth who allegedly committed a

_____

[3]Additionally, we note with respect to Bone's ADEA claim that the same decision maker that hired her when she was older than forty decided to fire her approximately fourteen months later. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361-62 (7th Cir. 2001) ("[I]t is eminently reasonable to doubt that, as in this case, a worker hired at an age well beyond that at which the protections of the age discrimination law click in and terminated *within months*, that is, before he is appreciably older, was a victim of age discrimination."); *see also Paup v. Gear Prods., Inc.*, 327 F. App'x. 100, 110 (10th Cir. 2009) (per curiam) (unpublished) ("[I]t would be eminently unreasonable to think that the manager became 'ageist' overnight.").

murder shortly after being released from AJATC. However, Bone has introduced no evidence that G4S believed Speight and Dr. Kirkendall committed the alleged disciplinary violation. *See Johnson*, 424 F.3d at 811 ("Johnson identifies no evidence that Ready Mixed believed that [the comparators] violated any duty to the company . . . or that management considered their conduct to be dishonest."). Moreover, even if Speight's and Dr. Kirkendall's alleged violation involved the same conduct and was of comparable seriousness to Bone's violations, G4S's alleged leniency in favor of Speight and Dr. Kirkendall does not support an inference of race or age bias or demonstrate that G4S's reason for discharging Bone was a pretext for such bias. Dr. Kirkendall is a Caucasian man who is older than forty and is thus a member of both of Bone's protected classes for her race and age discrimination claims, while Speight, though not Caucasian, is also older than forty. The fact that Dr. Kirkendall, a member of both of Bone's protected classes, was treated more leniently than Bone casts doubt on Bone's suggestion that the alleged lenience for either comparator is evidence of pretext or prohibited bias. *See Hitt*, 356 F.3d at 925 (noting that "one of the two employees who received this alleged leniency was aged 51, and thus a member of the protected class under the ADEA"). We reject Bone's argument that Speight and Dr. Kirkendall are adequate comparators.

Finally, Bone contends that her successors as education director and as special education supervisor are less qualified than she and that this difference in qualifications demonstrates pretext. However, Hunt is a Caucasian woman over the age of forty, and thus a member of both of Bone's protected classes. Dr. Thomas is also over age forty, and thus a member of one of Bone's protected classes. Once again, any favorable treatment Hunt received cannot reasonably be ascribed to racial or age-related animus. *See id.* at 925. Moreover, Dr. Thomas arrived at G4S with twenty-five years of experience superintending schools and school districts, and Bone identifies no evidence that she had comparable experience. We thus reject Bone's argument that G4S's decision to employ Hunt and Dr. Thomas in the positions she previously filled supports her claim of pretext.

Bone contends that G4S gave conflicting accounts of why she was discharged and that this shift in explanations is evidence that G4S's reasons for terminating her employment are merely a pretext for intentional discrimination on the basis of age and race. Specifically, she contends that G4S told DYS employees that Bone's employment had been terminated but told EEOC officials that Bone had quit. She also points out that Speight testified that he had no plan to fire Bone before their meeting on May 7 and that Knott stated at one point that he did not know why she quit. She contends that Knott changed his story when he said that he fired her because of problems with "performance and client relations." G4S's description of Bone's separation does not, however, establish pretext.

A change in an employer's legitimate, nondiscriminatory reason for firing an employee is probative of pretext only if the discrepancy is "substantial." *See Twiggs v. Selig*, 679 F.3d 990, 994 (8th Cir. 2012). The district court correctly concluded that Bone's allegations of shifting explanations amounted to "nothing more than a semantic dispute" as to whether G4S's ultimatum to resign or be fired was a resignation or a termination. Although Bone correctly points out that Speight testified that he had no plan to fire Bone prior to the meeting, Knott was the one who made the decision to request Bone's resignation. Knott further testified that during the meeting he decided to "go another direction" so he gave her "the opportunity to resign." Bone did in fact resign after G4S told her to resign or be fired. Knott's testimony that he did not know why Bone chose to resign is not inconsistent with his testimony explaining why he forced her to choose between resigning or being fired. Nor is it inconsistent for Knott to testify that Bone was fired for "performance and client relations" problems and then elaborate that she was resistant to the requests of DYS employees, lost their trust, and failed to follow their directives. We reject Bone's contention that she identified a substantial shift in G4S's nondiscriminatory reasons for terminating her employment and thereby demonstrated that G4S's

proffered reason for the discharge was merely a pretext for race or age discrimination. *See id.* (holding that a shift in explanation was not substantial because "all explanations of the firing . . . revolved around the release of" the youth).

### 3. Other Instances of Discrimination

Finally, Bone argues that she provided evidence of other instances of discrimination that demonstrates that G4S's proffered reason for terminating her employment was merely a pretext for race and age discrimination. First, she contends that Norma Wynn, an African-American dorm supervisor, ordered Bone to clean a restroom. However, the record indicates that cleaning restrooms is part of the responsibility of educational staff. There is no evidence that Wynn's order was motivated by racial animus. Second, Bone contends that Dr. Thomas received a higher salary than she as education director. However, G4S explained that Dr. Thomas received a higher salary because of Dr. Thomas's more extensive experience as a school superintendent. Neither Dr. Thomas's salary nor Bone's sanitation assignment support Bone's contention that G4S's rationale for terminating Bone's employment was merely a pretext for race or age discrimination.

Because Bone did not create a genuine issue of material fact as to whether G4S's legitimate, non-discriminatory reason for terminating her employment was merely a pretext for intentional race or age discrimination, the district court did not err in granting summary judgment in favor of G4S and Todd Speight on Bone's race and age discrimination claims.

## C. FMLA

As relevant here, FMLA provides an eligible employee with twelve work-weeks of unpaid leave during any twelve-month period if she has "a serious health condition that makes [her] unable to perform the functions of [her] position." 29

U.S.C. § 2612(a)(1)(D). FMLA authorizes two types of claims: interference claims and retaliation claims. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011). In an interference claim, "the employee alleges that the employer denied or interfered with her substantive rights under the FMLA." *Id.* In a retaliation claim, "the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Id.* However, "[a]n employee who requests FMLA leave has no greater protection against termination for reasons unrelated to the FMLA than she did before taking the leave." *Estrada v. Cypress Semiconductor (Minn.) Inc.*, 616 F.3d 866, 871 (8th Cir. 2010). "If the employer can prove that it would have terminated the employee had the employee not exercised FMLA rights, the employer will not be liable." *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012). Bone contends that G4S interfered with her FMLA rights by failing to reinstate her to an equivalent position after her leave and by failing to provide her with notice of her FMLA rights. Bone also asserts that G4S terminated her employment in retaliation for her FMLA leave.

Bone's interference claim fails because Bone was allowed to take leave for her surgery and to return to the same position she had before she left. As a threshold matter, the record reveals that G4S posted a notice of employee FMLA rights in the workplace and provided a notice in the employee handbook, which Bone indisputably received on March 3, 2007. Furthermore, Bone actually took leave for her surgery and recovery. Moreover, Bone concedes that she began her new position as special education supervisor in February 2008, a month before her surgery. This was the same position to which she returned after her leave. Bone contends that the post-leave position was not equivalent to her pre-leave position because G4S forced her to substitute temporarily for an absent teacher, arguing that teaching classes is not part of her duties as an administrator. She also argues that forcing her to substitute as a teacher interfered with her FMLA rights because such work was inconsistent with the medical restrictions on her return to work. However, Bone provides no evidence that substituting for an absent teacher is not a part of the duty of a school

-15-

administrator. Furthermore, Bone did not submit any evidence that her medical condition prevented her from teaching or that she communicated such a restriction to G4S. Upon returning to work, Bone informed G4S that her shoulder should not be hit or bumped and provided G4S with a doctor's note indicating that she could not use her arm, but the note did not state that Bone could not teach classes or that her availability for work was otherwise restricted. Although G4S was aware that some AJATC students are "dangerous," there is no indication in the record that Bone ever communicated to G4S that temporarily teaching this particular class would be expected to lead to physical impacts or otherwise violate the medical condition of her return to work. Thus, Bone has failed to raise a genuine issue of fact as to whether G4S failed to provide her with notice of her FMLA rights, prevented her from taking leave, failed to reinstate her to an equivalent position upon her return from leave, or otherwise interfered with her FMLA rights.

Bone has also failed to raise a genuine issue of fact as to whether G4S retaliated against her for exercising her FMLA rights. Bone contends that the proximity in time between when she took leave and when G4S terminated her employment is sufficient to establish that the termination was retaliatory. However, even Bone testified that G4S was "wonderful" to her regarding her surgery. Moreover, as we concluded above, G4S provided a legitimate, non-discriminatory reason for Bone's termination that was unrelated to her leave. The fact that Bone recently had taken FMLA leave does not insulate her from "termination for reasons unrelated to the FMLA." *Estrada*, 616 F.3d at 871. Thus, the district court did not err in granting summary judgment on Bone's FMLA claims.

## III.    CONCLUSION

For the foregoing reasons, we affirm.

––––––––––––––––––––––––––––––