# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-2785

_____

Xuan Huynh

*Plaintiff - Appellant*

v.

United States Department of Transportation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 13, 2015
Filed: July 24, 2015

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Xuan Huynh brought this employment discrimination action against the Department of Transportation ("DOT") under Title VII, 42 U.S.C. § 2000e-2, and the Minnesota Human Rights Act, Minn. Stat. Ann. § 363A.08. Huynh, a Vietnamese American, alleges that the DOT's Federal Aviation Administration ("FAA") discriminated against him based on race when it terminated his employment as a

trainee air traffic controller. The district court[1] concluded that Huynh had failed to show that the FAA's stated reason for firing him was a pretext for racial discrimination. It granted summary judgment to the DOT, and Huynh appeals. We affirm.

I.

Huynh began working at the FAA in 2009. After graduating from the FAA Training Academy in Oklahoma, he accepted a position as a trainee air traffic controller at the Minneapolis Air Route Traffic Control Center (the "Center"). The Center is one of 21 "en route" control facilities which guide aircraft flying over the United States. The Center's airspace is divided into six areas based on geography and altitude. These six areas are each subdivided into six sectors, and each sector has both a radar controller and a data controller position. Trainees like Huynh are required to certify at both of these positions in each of the six sectors within their assigned area—a total of twelve positions to be certified for each trainee.

Huynh's training at the Center was governed by the FAA's Air Traffic Technical Training Order (the "training order"). Under the training order, trainees are allotted a set number of "on the job" training hours at the radar and data controller positions within the sectors of their assigned area. Trainees may receive a limited number of additional hours if their trainers believe they can certify within the additional time, but additional hours are not guaranteed. After completion of the allotted training hours for any given position, a trainee is required to complete a "certification skill check." A trainee is subsequently either certified or suspended from the training program. A trainee can also be suspended for performing poorly on performance skill checks administered monthly to ensure that the trainee is

---

[1] The Honorable David S. Doty, United States District Judge for the District of Minnesota.

progressing appropriately. If a trainee is suspended after a skill check, a board composed of two supervisors and a union representative reviews the trainee's performance and issues a recommendation to the air traffic manager, the Center's highest authority, on whether additional training is warranted. If the air traffic manager chooses not to provide additional training, a trainee may attempt to transfer to a different center or face termination.

Upon his arrival at the Center, Huynh was assigned to train in Area Six. He completed classroom and lab instruction, after which he was assigned to a training team to instruct and evaluate him as he completed on the job training. A training team is made up of two on the job training instructors and a training supervisor who administers skill checks and final certification checks at each of the twelve air traffic controller positions within a trainee's assigned area. After each training session, the training team provides the trainee with a detailed written performance evaluation that records the trainee's progress on seven major job tasks and 25 separate subtasks. These written forms notify the trainee of performance areas needing improvement and help training review boards and the air traffic manager assess a trainee's ability to perform the duties of an air traffic controller.

Huynh was initially assigned to complete on the job training with training supervisor Lyle Madsen and training instructors Nancy Toren and Barbara O'Shea. He was allotted 180 hours under their instruction to certify as a data controller at Sector 27. Huynh reported problems with both his instructors. According to him, Toren told him he would not make it through training if he crossed her and accused him unfairly of being argumentative during their training sessions. Huynh also asserts that he did not get along with O'Shea. Huynh claims that he was treated more harshly than the other members of his training class and points out that he was the only Asian American member of the group. After complaining to his training supervisor and requesting a new training team through his union representative, he

was promptly assigned a different team. The new training team consisted of training supervisor Greg Santer and training instructors Todd Martenson and Brian Vance.

Vance and Martenson reported that Huynh was performing poorly for the Sector 27 data controller position. Huynh was granted 42 additional on the job training hours above that position's 180 target hours so he could improve. After he completed his additional training hours, Martenson recommend that training supervisor Santer certify Huynh at Sector 27 since he and Vance had taken over as his training team near the end of his allotted hours there. Martenson wanted to give Huynh a chance to start anew at another sector. Supervisor Santer agreed and certified Huynh as a Sector 27 data controller.

Huynh was then assigned to complete training and certify as a data controller at Sector 38, the second of his twelve required certifications. He was again allotted a target maximum of 180 on the job training hours. Vance and Martenson reported that Huynh performed poorly throughout his training. They noted that he could not apply his theoretical knowledge to live situations or adapt to changing air traffic patterns. Huynh's training team provided him with numerous opportunities to improve his skills in training simulations beyond his 180 target hours. Nevertheless, Huynh's performance did not improve. Martenson reported that Huynh did not have command of basic air traffic control terminology and geography and that he was defensive when trainers brought mistakes to his attention. Training supervisor Santer conducted skill checks to assess Huynh's progress and concluded that his skills were well below what would be expected given his amount of training.

Because of Huynh's poor performance on two different skill checks, Santer recommended his training be suspended. At that point Huynh had completed 85 of his target 180 hours as a data controller at Sector 38. Suspension of a trainee prior to completion of the target training hours is within a supervisor's discretion, and the Center's air traffic manager, Kelly Nelson, agreed with Santer that Huynh's training

should be suspended and evaluated by a review board. Huynh was the only member of his class suspended for poor performance on a skill check before completion of his 180 target hours, but he was also the only trainee who had been granted an opportunity to start anew at a different sector after requesting a new training team. While certifying at Sector 27, Huynh had received 42 additional on the job training hours beyond his target 180 hours.

Immediately following his suspension, Huynh attempted to transfer from the Center to a lower level air traffic control facility. There are two different processes for transfer between facilities. The first is an Employee Request for Reassignment ("ERR"). A trainee may request an ERR transfer to any facility at any time for any reason. That process is initiated by the trainee sending an application to a receiving facility. If that facility wants to hire the trainee, it will contact his original facility to secure a release. Management at the trainee's original facility is not typically involved in the ERR process and may not receive notice about a potential transfer until the receiving location calls to request a trainee's release. Trainees may also transfer through an Article 61 process which is initiated after the air traffic manager decides to remove a trainee from a program. The air traffic manager may recommend a trainee for an Article 61 transfer at the manager's discretion. Huynh applied for dozens of positions through ERR, but no other facilities offered to hire him. During the same period he also contested his suspension before the review board.

A three member review board examined Huynh's written training records and interviewed Vance, Martenson, Santer, and Huynh. They concluded that although Huynh had been given comprehensive training, he had failed to progress. Two members of the panel voted to discontinue Huynh's training, while one thought he should be given another chance. Air traffic manager Nelson reviewed the board's recommendation and decided to continue Huynh's training under a new plan. Huynh received additional classroom instruction, allowing him another opportunity to learn the basic terminology and geography that he had previously failed to master. Since

Huynh's training had been suspended for over a month at that point, he was given several weeks to study and refresh his learning. Santer thereafter conducted a skill check, determined that Huynh had returned to his prior level of performance, and restarted his on the job training as a data controller at Sector 38 under instructors Vance and Martenson.

Shortly after Huynh returned to on the job training, he reported problems with his supervisors and classmates. According to Huynh, training supervisor Santer began belittling and criticizing him. Santer's written training reports indicate that he had informally reprimanded Huynh for sitting idle with his eyes closed during at least one training session and for playing with his cell phone when he should have been studying the basic air traffic controller terminology, aircraft characteristics, and geography that his trainers had repeatedly told him he needed to learn. Huynh claims that he was on break at the time of these incidents and that the white members of his training class had not been similarly reprimanded.

Huynh complained to Patrick Sullivan that Santer had been treating him too harshly. Sullivan was the Center's operations manager for Areas Five and Six, and he spoke with Santer about Huynh's concerns. Sullivan then advised Huynh that Santer had been trying to help him succeed and had counseled him appropriately, and he declined to assign Huynh a new training supervisor. Huynh points out in contrast that Sullivan had assigned a new supervisor for a white coworker who had also complained about Santer's training methods.

Huynh claims in addition that he told Sullivan some coworkers had used racial slurs around him, referred to racial stereotypes, and imitated an "Asian accent" in his presence. He also told Sullivan that he had found a McDonald's job application in his headset bin at work, which he interpreted to be an insult and a comment on his ability to perform his job. Sullivan addressed that incident immediately by reporting it to the Center's staff manager who forwarded it on to the FAA's internal accountability

board. Sullivan also held a training session on workplace behavior for all the controllers in Area Six.

Thereafter Sullivan worked with Huynh and a union official to accommodate a transfer to a different area within the Center. Huynh had told the union official that he wanted a transfer to Area Three because "no one fails training in Area Three." Sullivan and the union official both agreed, however, that Huynh's best chance of success would be a transfer to Area Five. That area shared a border with Area Six and would have allowed Huynh to continue using much of the specific route and area training he had already received. Huynh nevertheless chose to remain in Area Six.

Huynh's performance initially showed signs of improvement after he was reinstated and given a new training program, but that improvement did not continue. Training instructor Vance noted that Huynh still failed to learn basic aircraft characteristics and argued with his instructors. Santer conducted multiple performance skill checks over the course of Huynh's renewed on the job training and noted that Huynh performed routine tasks well, but lacked the ability to apply his training in unpredictable or evolving situations. Santer noted more than eight areas in which Huynh's performance was deficient, and he assigned additional training simulator sessions to help Huynh make the required improvements.

Upon completion of Huynh's target 180 training hours at the Sector 38 data controller position, Santer administered a certification check during which Huynh performed poorly in the same areas that had been identified in his earlier skill checks. Santer recommended suspension of Huynh's training, and the agency convened a second training review board. That board interviewed Huynh, his union representative, Martenson, Vance, and Santer and reviewed the written records from Huynh's second round of training. The review board concluded that Huynh still lacked basic proficiency in air traffic communications, sector knowledge, and familiarity with aircraft characteristics. It unanimously recommended discontinuation

of Huynh's training, reasoning that additional simulations and on the job instruction would not overcome his deficiencies. Air traffic manager Nelson reviewed the board's recommendation and Huynh's training records before deciding to discontinue his training.

Huynh was notified in February 2011 that he would be demoted, reassigned, or separated from the agency. Although he had applied for dozens of transfers to lower level facilities through the ERR process, no facilities had moved to hire him. Given his impending termination, Huynh requested recommendation letters to facilitate his ERR transfer to a lower level facility. Sullivan offered to write him a letter for a lower level position, but not for an air traffic controller position. Santer declined to recommend Huynh although he wrote a letter of recommendation for one of Huynh's white classmates who transferred through the ERR process. The summary judgment record indicates that recommendation letters are not required for ERR transfers and are not ordinarily part of the ERR process.

Given his inability to find a receiving facility willing to hire him through the ERR process, Huynh requested that Nelson permit him to begin the Article 61 transfer process. That process may be initiated at an air traffic manager's discretion after suspension of training. After careful review of Huynh's training record, Nelson stated that because countless lives depend on the ability of air traffic controllers to perform their duties, he could not in good conscience support transferring Huynh to serve as an air traffic controller either at the Center or at a lower level facility. Nelson did however initiate an Article 61 transfer process for five of Huynh's white classmates after they failed to certify at the Center.

Huynh filed a timely charge of discrimination against the DOT, and in December 2012 he brought this employment discrimination action in federal district court under Title VII, 42 U.S.C. § 2000e-2, and the Minnesota Human Rights Act, Minn. Stat. Ann. § 363A.08. He alleged that the DOT had discriminated against him

based on race when it terminated his employment as a trainee air traffic controller and refused his transfer requests. The district court concluded that Huynh had failed to show that the DOT's stated reason for firing him was a pretext for racial discrimination, and it granted summary judgment for the government. Huynh appeals.

## II.

We review de novo the district court's grant of summary judgment to the government. Ridout v. JBS USA, LLC, 716 F.3d 1079, 1083 (8th Cir. 2013). Summary judgment is appropriate if there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law. Id. A plaintiff "may establish unlawful employment discrimination through direct or indirect evidence." Bearden v. Int'l Paper Co., 529 F.3d 828, 831 (8th Cir. 2008).

The parties agree that there is no direct evidence of racial discrimination in Huynh's case, and thus "we apply the framework laid out in McDonnell Douglas Corp. v. Green" to determine whether he has "established a prima facie case" of employment discrimination. Id. (citing 411 U.S. 792 (1973)). Huynh must show that (1) he was a member of a protected group; (2) he was qualified to perform the job; (3) he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. Id. A "prima facie case creates a presumption of unlawful discrimination, shifting the burden of proof to the employer to present evidence of a legitimate, nondiscriminatory reason for its adverse employment action." Id. If "the employer can articulate a nondiscriminatory reason, the burden returns to the employee to prove that the proffered reason is pretextual." Id. at 831–32. Here, the parties dispute whether Huynh was subject to more than one adverse employment action and whether the nondiscriminatory reason the DOT gave for firing and refusing to transfer Huynh—his poor performance—was a pretext for racial discrimination.

Both parties agree that Hunyh's termination was an adverse employment action. Hunyh argues however that Santer's decision to suspend his training after he had only completed 85 of his allotted 180 hours for on the job training as a Sector 38 data controller amounts to an additional adverse employment action. He asserts that the interruption in his training made it impossible for him to perform as well after his suspension and complains that none of his white coworkers was suspended prior to completion of the allotted 180 target hours. Hunyh also claims that his instructors subjected him to further adverse employment actions by denying him recommendation letters written for his white classmates and by barring him from participating in as many training simulation exercises.

Huynh's argument overlooks the fact that not "everything that makes an employee unhappy is an actionable adverse employment action." LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 691 (8th Cir. 2001). Adverse employment actions "include termination, demotion, transfers involving changes in pay or working conditions, and negative evaluations used as the basis for other employment actions." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 969 (8th Cir. 1999) (citing Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997)). An "employer's denial of an employee's request for more training" after a leave of absence is not itself an "adverse employment action." Griffith v. City of Des Moines, 387 F.3d 733, 737 (8th Cir. 2004). Moreover, the undisputed record shows that Huynh was offered almost a month of additional classroom and other training after his leave of absence. He was also given numerous opportunities to engage in training simulations and afforded 42 additional hours for on the job training beyond the 180 hours that he had received at each of Sectors 27 and 38. Finally, while providing "negative references to potential employers" can qualify as an adverse employment action, Baker v. John Morrell & Co., 382 F.3d 816, 829 (8th Cir. 2004), the denial of a positive recommendation letter to Huynh did not rise to the level of a "material employment disadvantage, such as a change in salary, benefits, or responsibilities." LaCroix, 240 F.3d at 691. We

conclude that the only adverse employment action taken against Huynh was his termination from the training program.

The only remaining issue between the parties is whether Huynh established a genuine dispute of material fact about whether the DOT's reasons for firing him and denying him a transfer were pretext for racial discrimination. See Bearden, 529 F.3d at 831–32. Huynh argues that racist comments and jokes made by his coworkers, the harsh treatment he received from his supervisors, the discovery of a McDonald's job application in his personal effects at work, and Sullivan's refusal to transfer him to Area 3 all combined to create an inference that the DOT's stated reason for firing him was a pretext for racial discrimination. We have previously concluded that occasional insensitive comments like those made by Huynh's coworkers were "stray remarks" rather than "persuasive evidence of motive when the remarks are made by persons other than a decisionmaker." Hitt v. Harsco Corp., 356 F.3d 920, 925 (8th Cir. 2004).

Many of Huynh's complaints about criticism by his supervisors and their denial of his transfer request are familiar "instances of a subordinate employee being subjected to the criticism and control of a supervisor." Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1047–48 (8th Cir. 2003). Although supervisors Toren and Santer forcefully criticized Huynh for being argumentative and for failing to study, their comments "did not suggest any reference to race or national origin" nor did they support "an inference of discriminatory intent." Id. at 1047. Furthermore, the summary judgment record establishes that air traffic manager Nelson, supervisor Santer, and instructors Martenson and Vance repeatedly gave Huynh second chances and additional instruction when they could have fired him. We conclude that Huynh has not shown that any of the actions or statements made by his supervisors "create a reasonable inference of discrimination," as they "do not suggest discriminatory animus without resorting to speculation." Takele v. Mayo Clinic, 576 F.3d 834, 839 (8th Cir. 2009).

Finally, Huynh attempts to establish pretext "by showing that he was treated differently than other employees who were similarly situated in all relevant respects." Austin v. Long, 779 F.3d 522, 525 (8th Cir. 2015). He asserts that he was denied a transfer to another facility after he failed to certify, while seven of his white classmates were allowed to transfer even though they had also failed to certify. At "the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 956 (8th Cir. 2012). That is, the "individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Id.

Five of the seven putative comparators transferred through the Article 61 process which must be initiated by air traffic manager Nelson. Huynh asserts that Nelson treated him differently from other similarly situated white trainees by allowing them to proceed through that process but denying him the same opportunity. The record shows however that air traffic managers like Nelson determine whether to initiate the Article 61 process based on written training reports authored by a trainee's immediate supervisors, and all five of the Article 61 transferees identified by Huynh "are not valid comparators because they had different immediate supervisors." Bone, 686 F.3d at 956.

The two remaining putative comparators transferred through the ERR process, and Huynh admits that his supervisors did not control whether a receiving facility would accept such a transfer. The fact that "different decision makers are involved" in accepting each transfer through the ERR process is "strong evidence of noncomparability." See Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992). Huynh nevertheless argues that supervisor Santer wrote a recommendation letter for one of the two white comparators who then successfully secured an ERR transfer, but refused to write a similar letter for him. The summary judgment record indicates that recommendation letters are not required for ERR transfers and are not ordinarily part

-12-

of the ERR process. Furthermore, Santer's decision to write a letter for one trainee does not change the fact that each ERR transfer involves "different decision makers," Jones, 973 F.2d at 676, and Huynh has not identified coworkers "who were similarly situated in all relevant respects." See Austin, 779 F.3d at 525. This argument by Huynh thus fails, and we conclude that the district court properly granted summary judgment to the government because Huynh has not shown that the DOT's stated reason for firing him was a pretext for racial discrimination.

For these reasons we affirm the judgment of the district court.

_____