# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1427

_____

Richard A. Burton

*Plaintiff - Appellee*

v.

Arkansas Secretary of State; Mark Martin, In his Official Capacity as Arkansas Secretary of State; Darrell S. Hedden, In his Individual and Official Capacity as Chief of Police for State Capitol Police

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 25, 2013
Filed: December 17, 2013

_____

Before WOLLMAN, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Richard A. Burton sued his former employer, Arkansas Secretary of State Mark Martin ("Secretary of State"), in his official capacity, and the Chief of the Arkansas State Capitol Police, Darrell Hedden, in his individual and official capacity, (collectively, "state defendants") for race discrimination and retaliation under Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1983; and the Equal Protection Clause of the Fourteenth Amendment. Thereafter, the state defendants moved for summary judgment. The district court denied the state defendants' motion for summary judgment on Burton's race discrimination and retaliation claims. The court concluded that Burton could pursue his Title VII claims against all defendants but that the Eleventh Amendment barred his § 1983 claims against the Secretary of State and his claims for monetary damages against the Secretary of State and Chief Hedden in their official capacities. The district court also denied Chief Hedden qualified immunity, concluding that Burton could pursue his § 1983 claims for prospective injunctive relief and monetary damages against Chief Hedden in his individual capacity. Additionally, the district court denied summary judgment to the state defendants as to mitigation of damages and punitive damages. But the court granted summary judgment to the state defendants on Burton's 42 U.S.C. § 1981 claims, hostile-work environment claim, and claim of deprivation of a protected property or liberty interest.

The state defendants appeal the district court's denial of qualified immunity to Chief Hedden on Burton's § 1983 claims for race discrimination and retaliation. They also ask this court to review the district court's denial of summary judgment to them on Burton's Title VII claims, contending that these claims are inextricably intertwined with resolution of the qualified-immunity issue. For the following reasons, we affirm the district court's decision in all respects, except we reverse its denial of qualified immunity to Chief Hedden on Burton's § 1983 equal-protection retaliation claim because no clearly established right exists under the Equal Protection Clause to be free from retaliation. We remand for further proceedings consistent with this opinion.

## I. *Background*

"We recite the facts in the light most favorable to [Burton] because [he] was the non-moving party." *Brown v. City of Jacksonville*, 711 F.3d 883, 885 n.3 (8th Cir. 2013) (citation omitted).

From June 9, 2009, until his termination on April 12, 2010, Burton, an African American, was employed as a certified law enforcement officer with the State Capitol Police by the Secretary of State. Before joining the State Capitol Police, Burton worked as a certified law enforcement officer with the Pine Bluff Police Department for nearly four years.

Chief Hedden offered Burton the officer position in a meeting with Sergeant David Huggs. During the meeting, Chief Hedden advised Burton that he would be working the 3:00 p.m. to 11:00 p.m. shift with Officer Norman Gomillion, Assistant Chief Theo Pierce, and Officer Danny Winters, all white males. According to Burton, Chief Hedden told Burton that this "shift was full of rednecks" and "from time to time they may say some things that may be offensive" to Burton. Chief Hedden instructed Burton to come see him "if they did anything that bothered [Burton]." Chief Hedden also informed Burton that his salary would be $37,500 per year. Once Burton successfully completed the six-month probationary period, Burton would receive "[a]nother $2,500." Burton successfully completed the six-month probationary period. On December 7, 2009, six months after Burton's hire, Chief Hedden made written request to his immediate supervisor, Cathy Bradshaw, Deputy Secretary of State, to give Burton a raise.

Each person hired by the State Capitol Police receives a State Capitol Police Policy and Procedures Manual and a Secretary of State Personnel Manual and is instructed to read both. Among other things, the manuals contain policies regarding complaints, appeals procedures, and standards of conduct. Burton acknowledged receipt of both manuals on June 5, 2009.

On December 8, 2009, Burton contacted Chief Hedden and informed him that Officer Gomillion had made offensive remarks about Burton and Randy Hitch, another African-American employee, to Robin Lang, a white, female member of the housekeeping staff. Officer Gomillion referred to Burton and Hitch as "n****rs."

Burton alleges that Officer Gomillion often used racial epithets in Lang's presence, expressing his dislike for African Americans and his view that whites were superior to blacks. Lang and Burton worked the same shift and discussed Officer Gomillion's comments. When Officer Gomillion saw Lang with two African-American males, Lang claims that Officer Gomillion said, "[Y]ou don't do that n****r thing, do you[?]" When Lang asked Officer Gomillion what he meant, he replied, "[Y]ou don't do that n****r thing, you don't date n****rs, do you?" Lang also claims that Officer Gomillion "referred to [President] Obama at that time as being the n****r in the office that was going to bring the United State[s] down." According to Lang, she often considered reporting Officer Gomillion but felt like she would be wasting her time.

Chief Hedden instructed Burton to prepare a written complaint regarding Officer Gomillion's behavior. On December 9, 2009, Burton submitted a handwritten complaint setting forth Officer Gomillion's racially offensive comments, as well as the statements of Lang, Hitch, and Misty Lane, another employee. Chief Hedden told Burton that he needed to type his complaint and resubmit it, which Burton did.

After receiving Burton's complaint, Chief Hedden read it and the witness statements and met with Officer Gomillion. As the district court noted, "[t]he record evidence does not indicate Chief Hedden took any other steps to investigate." *Burton v. Martin*, No. 4:11–cv–710 KGB, 2013 WL 598123, at *2 (E.D. Ark. Feb. 16, 2013). Officer Gomillion denied making the racially offensive comments and offered to take a polygraph test. On December 14, 2009, Chief Hedden issued Officer Gomillion a "Letter of Counseling." In the letter, Chief Hedden advised Gomillion of the written complaint lodged against him; "remind[ed] [him] that any derogatory or racially motivated remarks can be considered harassment and will not be tolerated"; and "cautioned that any future complaints regarding inappropriate, offensive, and/or derogatory statements made toward African-Americans will be considered a violation of Secretary of State Policy and Procedure and may result in corrective action against [him]."

-4-

On January 22, 2010, Burton inquired via email about the status of his complaint against Officer Gomillion. Chief Hedden denies receiving this email. On January 25, 2010, Chief Hedden emailed Bradshaw to inquire about the status of his raise request for Burton. The Secretary of State granted Chief Hedden's request to increase Burton's pay on February 9, 2010.

On February 16, 2010, Burton alleges that Officer Gomillion threw a set of keys at Burton and Hitch. Burton notified Chief Hedden of the incident that evening. The next day, Burton submitted a written statement regarding the incident to Sergeant Huggs. Thereafter, Assistant Chief Larry Robinson, Sergeant Huggs, and Officer Charlie Brice, who is also African American, met with Burton. Assistant Chief Robinson showed Burton the at-will employment policy, which Burton understood as providing "that anybody can be fired for any reason at any time." Assistant Chief Robinson insisted that Burton read the policy, even though Burton had already made clear that he knew what the policy stated. Assistant Chief Robinson then showed Burton a "new shift rule[], saying that there is no bickering amongst employees." Burton asked Assistant Chief Robinson if he was referring to Officer Gomillion and inquired about the status of his complaint. Burton claims that Assistant Chief Robinson replied that "if y'all stop aggravating [Officer Gomillion], this stuff wouldn't happen."

On March 26, 2010, Burton worked a traffic accident. Although State Capitol Police Policy #2004-68 requires an officer to complete a traffic accident report prior to the end of that officer's shift, Burton did not complete the report before the end of his shift that day. According to Burton, when he attempted to complete the report, Sergeant Huggs told him not to complete the report until Sergeant Huggs could show Burton how to enter it into the computer system. Over the next few days, the individuals involved in the accident called requesting copies of the accident report. State law requires that the Arkansas State Police receive all traffic accident reports within five days.

In March 2010, Burton requested to work part-time for a private party providing security. Chief Hedden approved this request but warned Burton not to let his part-time work interfere with his full-time job. On March 30, 2010, Burton was scheduled to work beginning at 3 p.m., but he overslept after having worked at his other job on the night of March 29, 2010, until 7 a.m. on March 30, 2010. Burton called in at approximately 5:30 or 6 p.m. and spoke with Sergeant Huggs, who told Burton not to come in and to report the following day.

The next day, Burton reported to work, and Chief Hedden showed Burton how to enter the accident report into the system. That same day, Burton was issued an "Official Letter of Reprimand" based on his failure to report to work as scheduled on March 30, 2010, and failure to complete the accident report in a timely manner. With regard to absence on March 30, 2010, the letter stated:

> On Tuesday March 30, 2010, you failed to report for duty as scheduled and also failed to contact this department in adequate time so arrangements could be made with other personnel for proper shift coverage. You made contact with the department at approximately 6:00pm on March 30, 2010, three hours after the start of your shift, and stated you had over slept [sic]. Sergeant Huggs advised you at that time not to report for duty on that date due to half of the shift being completed.

The letter directed Burton to "make note of the following departmental policies." First, "Policy Number 2004-55 'POLICE OFFENSES: DISCIPLINARY,'" provided for employee discipline for "[a]bsence from duty without approved leave." Second, "State Capitol Police General Orders #1" provided that "[a]ll Capitol Police personnel must report for duty on time and according to their shift schedule." Third, "Policy #2004-65" concerning "Punctuality" provided that "[e]mployees shall be present for duty as scheduled unless a supervisor authorizes absence."

With regard to Burton's off-duty employment, the letter stated:

> On Thursday March 4th 2010, you sent me a memorandum requesting authorization to work off-duty at the Rockefeller Mansion on Monday nights. I approved this request and provided you with a memorandum dated Friday March 5th 2010 stating "that if any situation arises that may conflict with the operations of this department or adversely affect the Capitol Police or Secretary of State's Office this off-duty employment will discontinue."

The letter directed Burton to "take note of" "Policy #2004-51" concerning "Off -Duty Employment," which provides that "[n]o Officer . . . of this department shall engage in any outside employment . . . which is in conflict with the duties of his/her employment, or which is adverse to the interest of the Secretary of State's office or the State Capitol Police."

Finally, as to Burton's failure to timely complete the accident report, the letter provided:

> On Friday March 26, 2010 at approximately 15:56 hours (3:00 pm), you were dispatched to a reported automobile accident at Capitol Avenue and Wolf Street. You responded to the accident and wrote two citations to one of the individuals involved in the accident. You[] worked the remainder of the shift on March 26th without completing the accident report or turning in the citations issued. You worked on March 27, 2010 from 3:00[]pm until 11:00 pm and again failed to complete the accident report or turn in the citations issued.

> The citizens involved in the accident requested a copy of the accident report on March 29th, 30th, and 31st and have had to be told by this office that the investigating officer has not completed the accident report as of this date. You have had adequate time to complete the accident report and have it and all related documents turned in to this office.

The letter directed Burton to "make note of the following departmental policies." First, "Policy #2004-68" entitled "Report: Police Procedures" directed officers to complete reports "at any time police services are requested, or any[]time police action is required or taken." Officers must "accurately complete[]" the reports under "prescribed procedure and submit[ ]to the supervisor prior to going off shift, unless a supervisor authorizes additional time." Second, "Policy #2004-69" entitled "Report: Failure to Prepare" provided that officers responding to a call, observing an offense, or receiving information from a complainant must "prepare a report, regardless of the action taken." It advised that an officer's "[f]ailure to prepare a report for an assigned case or from information received from a complainant or personal observation shall be cause for disciplinary action."

The letter concluded by finding Burton in "clear violation" of Policy #2004-65, Policy #2004-55, Policy # 2004-68, and Policy # 2004-69. In addition to denying Burton approval for continued off-duty employment, the letter also stated:

> You are also requested by this department to provide a written memorandum, within five days, explaining your reasons for failing to properly complete an accident report in a timely manner and your reasons for failing to report for duty as scheduled on March 30th 2010. You are also advised that March 30th 2010 will be recorded as leave without pay.
>
> You are advised that any future violations of department policies and/or procedures can result in additional disciplinary actions up to and including termination of employment.
>
> A copy of this *Official Letter of Reprimand* will be provided to you and a copy will be placed in your personnel file.

Burton did not provide the memorandum within the requested five-day period.

-8-

On April 7, 2010, Chief Hedden contacted Harmony Daniels of the Secretary of State's Human Resources Department to advise Daniels of Burton's failure to provide the memorandum. Daniels informed Chief Hedden that Burton's failure to provide the memorandum is "an additional violation" and directed Chief Hedden to "remind him that a written memorandum is due. Failure to comply with the request could result in further correcti[ve] action, up to and including termination of employment." Chief Hedden claims that he reminded Burton via email and text message to submit the memorandum, but Burton disputes receiving such communications.

On April 9, 2010, Chief Hedden reported Burton's failure to provide the memorandum to Bradshaw and "recommend[ed] [Burton's] employment as a Police Officer of this department be discontinued." In Chief Hedden's memorandum to Bradshaw, he stated:

> Because of Officer Burton's failure to follow policy and procedures that has led this department to issue an Official Letter of Reprimand, and because Officer Burton has willfully failed to follow the instructions and orders issued by supervisory personnel, he has failed to satisfactorily perform the duties of a police officer as required by this department. With this type of action it is apparent to this department that Officer Burton has chosen and will not be able to complete the 12–month probationary period[1] satisfactorily.

---

[1]As the district court explained:

> The Arkansas Commission on Law Enforcement Standards requires all certified law enforcement officers to complete a 12–month probationary period. Mr. Burton maintains that he completed this 12–month period while working at the Pine Bluff Police Department, while defendants maintain he was required to complete a 12–month probationary period with the State Capitol Police, as well.

*Burton*, 2013 WL 598123, at *3 n.3. We will address the relevance of Burton's status as a probationary employee *infra*.

On April 12, 2010, Burton was terminated for "[f]ailure to meet Commission 12[-]month probationary standards."

Burton brought suit against the Secretary of State, in his official capacity, and Chief Hedden, in his individual and official capacity for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1983; and the Equal Protection Clause of the Fourteenth Amendment. The state defendants then moved for summary judgment. The district court denied the state defendants' motion for summary judgment on Burton's race discrimination and retaliation claims. The court concluded that Burton could pursue his Title VII claims against all defendants but that the Eleventh Amendment barred his § 1983 claims against the Secretary of State and his claims for monetary damages against the Secretary of State and Chief Hedden in their official capacities. The district court also denied Chief Hedden qualified immunity, concluding that Burton could pursue his § 1983 claims for prospective injunctive relief and monetary damages against Chief Hedden in his individual capacity. Additionally, the district court denied summary judgment to the state defendants as to mitigation of damages and punitive damages. But the court granted summary judgment to the state defendants on Burton's 42 U.S.C. § 1981 claims, hostile-work environment claim, and claim of deprivation of a protected property or liberty interest.

## II. *Discussion*

The state defendants appeal the district court's denial of qualified immunity to Chief Hedden under § 1983 for Burton's race discrimination and retaliation claims. They also appeal the district court's denial of summary judgment to them on Burton's Title VII race discrimination and retaliation claims. They ask this court to exercise pendent jurisdiction, arguing that the appeal of these claims is "inextricably intertwined" with the qualified-immunity interlocutory appeal.

A. *Qualified Immunity*

We have jurisdiction under the collateral-order doctrine "to consider an interlocutory appeal of an order denying qualified immunity to the extent the appeal seeks review of purely legal determinations made by the district court." *Mitchell v. Shearrer*, 729 F.3d 1070, 1073 (8th Cir. 2013) (quotations and citations omitted). Therefore, "we have jurisdiction to consider whether the facts, taken in the light most favorable to [Burton], support a finding that [Chief Hedden] violated [Burton's] clearly established constitutional rights." *Id.*

A government official is entitled to qualified immunity "from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Id.* at 1074 (citations omitted). We apply a de novo standard of review to a district court's denial of summary judgment based on qualified immunity. *Id.* (citation omitted). We are obligated to "view the facts in the light most favorable to [Burton], accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed." *Id.* (citation omitted).

We apply a two-step analysis in making qualified-immunity determinations: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* (citations omitted). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"There is no question that [Burton's] right to be free from racial . . . discrimination was well-established at the time of [his] termination." *Wimbley v. Cashion*, 588 F.3d 959, 963 (8th Cir. 2009) (citing Civil Rights Act of 1964 § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice

for an employer to . . . discharge any individual . . . because of such individual's race, color, religion, sex, or national origin. . . . ")). We have previously recognized that "[t]he constitutional right to be free from [racial] discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Id.* (quotation and citation omitted). Therefore, we will address whether the facts, taken in the light most favorable to Burton, demonstrate the violation of Burton's constitutional rights.

### 1. *Section 1983 Race Discrimination Claim*

A plaintiff bringing a race discrimination claim may prove his case "by providing direct evidence of discrimination or by creating an inference of unlawful discrimination through the *McDonnell Douglas*[2] analysis." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012) (citation omitted). Burton presented no direct evidence of discrimination; therefore, "he must establish [race] discrimination through the *McDonnell Douglas* burden-shifting framework." *Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012) (citation omitted). Burton "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (citation omitted). Burton may "satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class." *Id.* (citation omitted). The state defendants must provide "a non-discriminatory, legitimate justification for [their] conduct, which rebuts the employee's prima facie case." *Bone*, 686 F.3d at 954 (quotation and citation omitted). "Once the [state defendants] provide[] this reason, the presumption of discrimination disappears, requiring [Burton] to prove that the proffered justification is merely a pretext for discrimination." *Twiggs*, 679 F.3d at 993 (quotation and citation omitted).

_____

[2]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

In their brief, the state defendants implicitly assume that Burton has satisfied his prima facie case and move directly to stages two and three of the *McDonnell Douglas* burden-shifting framework, contending that "[b]ecause [they] have shown a valid non-discriminatory reason for Mr. Burton's termination, '[t]he plaintiff must show that he and [the comparators] are similarly situated *in all relevant respects.*'" Brief of Appellants, *Ark. Sec'y of State v. Burton*, No. 13-1427, 2013 WL 1887005, at *17 (8th Cir. Apr. 29, 2013) (third and fourth alterations in original) (quoting *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009)). We may "assum[e], without deciding, that [Burton] presented a *prima facie* case of race . . . discrimination." *Bone*, 686 F.3d at 954 (citation omitted). Additionally, Burton has not challenged the district court's finding that the state defendants articulated non-discriminatory, legitimate justifications for terminating Burton due to his

> fail[ure], among other things, (1) to report to work as scheduled on March 30, 2010; (2) to inform his employer of his absence so that arrangements could be made for proper shift coverage; (3) to complete a traffic accident report before the end of his shift; and (4) to submit a written memorandum as requested by Chief Hedden. These alleged violations of company policy constitute evidence of a legitimate, nondiscriminatory basis for Mr. Burton's termination.

*Burton*, 2013 WL 598123, at *8 (citing *Putnam v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.")). And, we conclude that the district court correctly determined that the state defendants satisfied this non-onerous burden. *See Bone*, 686 F.3d at 954 ("This burden is not onerous.").

Therefore, Burton must "prove that the proffered justification[s] [are] merely a pretext for discrimination." *Id.* at 955 (quoting *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)). Burton bears "the burden of persuasion at all times." *Id.* (citing *Pope*, 406 F.3d at 1007). At this stage, Burton's obligation to demonstrate "a

genuine issue of material fact regarding pretext merges with the ultimate burden of persuading the court that [Burton was] the victim of intentional discrimination." *Id*. (quotation and citation omitted). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact as to whether the termination was motivated by intentional discrimination." *Id*. (quotation and citation omitted).

Burton argues, and the district court concluded, that Burton established pretext by demonstrating that similarly situated coworkers were treated more favorably. *See Burton*, 2013 WL 598123, at *9 (determining that Burton "identified Officer [Robert] Barham as a Caucasian employee who repeatedly reported to work late" and "reported to work late on three occasions during March and April 2010" without being required to "prepare a memorandum explaining his conduct").

> "At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson* [*v. City of Rochester*], 643 F.3d 1031 [(8th Cir. 2011) (en banc)]). To succeed with this argument, [Burton] must show that [he] and the [white] employees were "similarly situated in all relevant respects." *Id*. (quoting *Rodgers*, 417 F.3d at 853). That is, the employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004)).

*Muor v. U.S. Bank. Nat'l Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013). "Furthermore, '[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness.'" *Bone*, 686 F.3d at 956 (alteration in original) (quoting *Rodgers*, 417 F.3d at 853 (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972–73 (8th Cir. 1994))).

Although the standard for determining whether employees are similarly situated is "rigorous" at the pretext stage, *see Muor*, 716 F.3d at 1078, we do not require the plaintiff to produce evidence of "a clone." *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013). This court has previously described the inquiry as follows:

> The "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). In order to rely on comparator evidence such as [Burton] offers, he must prove only that the other employees were "similarly situated in all relevant respects." *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 487 (8th Cir. 1998) (quoting *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)). To demonstrate that they are "similarly situated," he "need only establish that he or she was treated differently than other employees whose violations were of *comparable seriousness*." *Id*. at 488 (quotation omitted, emphasis added). In *Lynn* we explicitly rejected the notion that comparator analysis requires that the compared employees engaged in "the exact same offense." *Id*. We observed that demanding that the compared employees have engaged in precisely identical conduct would make an employee's conduct which was more serious than that of the plaintiff irrelevant to the analysis. *Id*. "Common sense as well as our case law dictates that we reject such an approach." *Id.*
>
> The [*EEOC v*.] *Kohler*[3] rule could appear inconsistent with our court's earlier precedent including the *Lynn* case. To the extent that there were a real conflict, however, *Kohler* would yield to the earlier rule. *See Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc). We do not interpret *Kohler* to present a conflict because it simply stands for the unremarkable proposition that the ideal comparator will match the characteristics of the plaintiff employee in as many respects as possible. *See* 335 F.3d at 766. While no employee is a precise clone of another, *see Chaney*, 612 F.3d at 916, the probative value of comparator evidence will be greatest when the circumstances faced by the putative comparators are most similar to the plaintiff's. Where evidence

---

[3]716 F.3d 1079 (8th Cir. 2003).

-15-

demonstrates that a comparator engaged in acts of "comparable seriousness" but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause. *See Lynn*, 160 F.3d at 489.

The facts in *Lynn* are instructive. In that case, nurse Lynn had been previously disciplined for tardiness, a disrespectful attitude, lack of productivity, failure to assist a patient with therapeutic equipment, and incorrect document preparation. 160 F.3d at 486. He was eventually discharged because his work performance reflected "a serious lack of appropriate nursing judgment." *Id*. Lynn's comparator was another nurse named Mohr who had been repeatedly sleeping on the job, but who received only minor and belated discipline. *Id*. at 487 The district court considered Mohr's infractions to be different in type and thus not comparable; Mohr also had a less extensive disciplinary history than Lynn. *Id*.

We reversed the grant of summary judgment to Lynn's employer after concluding that the district court had erred by ignoring Lynn's comparator analysis. *Id*. at 488. While a factfinder could find the differences between Lynn and Mohr sufficient to defeat a claim of pretext, it would not e obligated to do so. *Id*. Mohr's sleeping on the job was a more serious offense than anything Lynn had been accused of, particularly since it had sometimes occurred while Mohr was the only nurse on duty. *Id*. In addition, the two had different disciplinary histories, at least arguably the result of disparate treatment. *Id*. Lynn had a sterling performance record prior to working under his last supervisor who was notably quicker to discipline him than Mohr. *Id*. Since Mohr's record showed "the same kind of 'serious lack of appropriate nursing judgment' that resulted in Lynn's discharge," the comparator analysis was sufficient to create a genuine fact issue over pretext. *Id*. at 489.

*Id*. at 1085–86 (concluding, in an age discrimination case, that a younger coworker was "a valid comparator for [the employer's] insubordination justification for its discharge of [the plaintiff]" where the younger coworker "[c]raft[ed] a mock Ku Klux

Klan hood and display[ed] it to an African American employee," and the plaintiff "rais[ed] [his] voice during an argument on a loud factory floor").

In the present case, we agree with the district court that Burton presented evidence at the pretext stage of at least one similarly situated coworker, Officer Robert Barham, a Caucasian employee.[4] First, the state defendants do not contest that Chief Hedden served as the supervisor to both Burton and Officer Barham. *See Muor*, 716 F.3d at 1078.

Second, we conclude that Burton and Officer Barham were "subject to the same standards." *See id* (quotation and citation omitted). The state defendants argue that the same standards did not apply to Burton and Officer Barham because Burton was a probationary employee, while Officer Barham was not. According to the state defendants, although Burton had completed his six-month probationary period under the Secretary of State's policy, he was still under a 12-month probationary period pursuant to Arkansas Commission on Law Enforcement Standards and Training Regulation 1003 ("Regulation 1003"). Chief Hedden referred to Regulation 1003 in his April 9, 2010 memorandum recommending Burton's termination; it provides that "[e]very officer employed or appointed below the level of department head shall satisfactorily complete a probationary period of not less than twelve (12) months with the employing department." The state defendants maintain that "[t]his court has repeatedly ruled that probationary employees are not similarly situated to veteran, non-probationary employees as a matter of law." Brief of Appellants, *Ark. Sec'y of State v. Burton*, No. 13-1427, 2013 WL 1887005, at *18 (8th Cir. Apr. 29, 2013) (citing *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000)). They conclude that because Burton was a probationary employee under Regulation 1003, Officer Barham, a non-probationary employee, is not a valid comparator.

---

[4]Burton also asserts that Officers Norman Gomillion and James Wiley are valid comparators. Because we conclude that Officer Barham is a valid comparator, we need not address whether these additional officers are also valid comparators.

In response, Burton asserts that he was *not* a probationary employee under Regulation 1003 because he had previously completed this 12-month probationary period while working at the Pine Bluff Police Department and thus was a certified officer at the time the Secretary of State's office hired him. Alternatively, Burton argues that Officer Barham was a probationary employee when he engaged in conduct similar to Burton's conduct.

Assuming, without deciding, that Burton was a probationary employee at the time of his termination, we conclude that Burton and Officer Barham were subject to the same standards because Officer Barham was also a probationary employee when he engaged in the relevant conduct. Officer Barham was placed on six-months probation on June 28, 2012, by Chief Hedden for failing to meet the firearm qualification. During this six-month probationary period, Officer Barham was issued a "Letter of Reprimand/Suspension" on October 2, 2012, for, among other things, being late for work on August 30, 2012; September 5, 2012; September 28, 2012; and October 2, 2012.

Finally, we conclude that Burton has "establish[ed] that he . . . was treated differently than [Officer Barham,] whose violations were of *comparable seriousness*." *Ridout*, 716 F.3d at 1085 (quotation and citation omitted). Burton has presented evidence that while both he and Officer Barham failed to report timely to work or missed work, Officer Barham was not terminated for such conduct. Burton admittedly failed to report to work on March 30, 2010, because he overslept after working off-duty the prior day. The "Official Letter of Reprimand" stated that Burton violated Policy #2004-65 (Punctuality) and Policy #2004-55 (Absence from duty without approved leave) based on this incident. Burton was ultimately terminated for failing to write the requested memorandum explaining his conduct. By contrast, Officer Barham has a litany of offenses concerning his failure to report timely to work and

-18-

abuse of leave, for which he was never terminated and, save for one instance, not required to write a memorandum.[5]

---

[5]Officer Barham's offenses are as follows:

1. On November 7, 2008, Chief Hedden issued Officer Barham a "Letter of Counseling" regarding Officer Barham's "fail[ure] to contact this department prior to the beginning of [his] shift to indicate [he] would not be at work" on November 6, 2008. "[O]ver four hours after the start of [his] scheduled shift," Officer Barham had contacted the department "and explained [he] had over slept." The letter provided that Officer Barham was in violation of, among other things, Policy #2004-65 (Punctuality). Chief Hedden requested that Officer Barham "provide a written memorandum explaining [his] reasons for failing to report for duty as scheduled on November 6, 2008." Unlike Burton, Officer Barham *did* provide the requested memorandum. But, we note that, although both Burton and Officer Barham violated department policy by oversleeping and failing to timely report to work, Chief Hedden issued Officer Barham a "Letter of Counseling" that was "not a form of disciplinary, but [was] presented to [Officer Barham] as a form of training in hopes [Officer Barham] [would] consider [his] actions and take appropriate steps to prevent this from happening in the future." By contrast, Chief Hedden issued Burton an "Official Letter of Reprimand" for similar conduct.

2. On March 15, 2009, Chief Hedden issued Officer Barham a "Letter of Reprimand" for abuse of sick leave, in violation of Policy #2004-47. According to the letter, Officer Barham requested a leave day on January 22, 2008, "to take care of a personal situation." He "used sick leave on this occasion to travel to Texas." Then, on January 25, 2009, Officer Barham contacted Chief Hedden and requested two leave days "to take care of a personal situation." Chief Hedden expected Officer Barham to report for work on January 28, 2008, but learned that Officer Barham "had called in sick the night of January 27th. [He] also called in sick on the night of January 28th." The letter referenced the prior "Letter of Counseling" issued on November 7, 2008, and stated that Officer Barham's "use of leave on January 22nd[,] January 27th[,] and January 28th clearly violate Policy #2004-47[,] line 1 and line 8," which provide that "[a]t all time, when utilizing sick leave, all employees are expected to give honest and truthful reasons for absences" and "[u]se of sick leave for reasons other than that which is outlined under this policy can result in corrective action up to and including termination of employment." In contrast to Burton's "Official Letter of Reprimand,"

Chief Hedden did not request in Officer Barham's "Letter of Reprimand" that he draft a written memorandum explaining his conduct.

3. On April 14, 2010, Assistant Chief Larry Robinson issued Officer Barham an "Official Letter of Reprimand," which Chief Hedden was provided a copy of and signed off on, outlining three occasions on which Officer Barham had arrived late to work: (1) March 22, 2010 (one hour late); (2) April 1, 2010 (one-and-a-half hours late); (3) April 14, 2010 (18 minutes late). The letter found Officer Barham in violation of Policy #2004-65 (Punctuality). This was Officer Barham's *second* "Letter of Reprimand" and, additionally, his *second* notification of violations of Policy #2004-65 (Punctuality). Yet, unlike Burton, Officer Barham was not required to draft a written memorandum explaining his conduct.

4. On April 6, 2011, Chief Hedden issued a "Letter of Counseling/Sick Leave Usage" to Officer Barham for abuse of sick leave. According to the letter, Officer Barham had called in sick on January 19, 2011; January 25, 2011; February 14, 2011; February 15, 2011; February 16, 2011; February 25, 2011; February 28, 2011; March 1, 2011; and March 23, 2011. As of April 6, 2011, Officer Barham had also used the eight hours of sick leave accrued on April 1, 2011. In total, "[s]ince January 1, 2011[,] [Officer Barham] ha[d] called in sick ten (10) times, a total of eighty hours." Because Officer Barham had "only accrued thirty-two (32) hours of sick leave since January 1[, 2011], . . . forty-eight (48) hours of other leave . . . had to be used to cover [his] sick leave shortage." In the letter, Chief Hedden expressed his belief that Officer Benham's "use of sick leave can be considered abuse of leave." Chief Hedden reminded Officer Barham that "excessive absences and tardiness can result in corrective action up-to and including termination of employment," but he did not request that Officer Barham draft a written memorandum explaining his use of leave. The "Letter of Counseling" was only "a form of training," reminding Officer Barham "of the policies of the Secretary of State and of this department concerning leave usage."

5. On October 2, 2012, Captain Charlie Brice issued a "Letter of Reprimand/Suspension" detailing Officer Barham's abuse of sick leave and failure to timely report. This letter provides, in relevant part:

Burton's disciplinary record and Officer Barham's disciplinary record contain comparable offenses—both failed to report timely to work or missed work. In addition, Officer Barham exhibited not only punctuality problems but also abused sick leave, yet he was never terminated. The state defendants assert that Officer Barham is not similarly situated to Burton because Burton ignored Chief Hedden's request for

On April 14, 2010 you were issued a written reprimand for Violation of Policy as it relates to Punctuality and on April 6, 2011 you were issued a Letter of Counseling for excessive sick leave usage.

Since January 1, 2012 you have used 15 days of sick leave and have now exhausted all sick leave accumulated. This constant use of sick leave is considered by this department as abuse of sick leave and cannot be tolerated.

You have also called in for issues non-related to sick leave where you stated you could not report to work and were allowed to take annual and or comp time to address the issue. You have been late for work on the following dates: August 30, 2012—15 minutes late, on September 5, 2012—7 minutes late, on September 28, 2012—10 minutes late, and on October 2, 2012 you were 7 minutes late.

\* \* \*

On June 28th, 2012, you were advised by written memorandum that you were being placed on a Six-Month probationary period with this department. You were told that the probationary period was intended to provide you an opportunity to demonstrate your abilities as an employee of this department and to provide this department the opportunity to evaluate your performance as an employee with this department.

Because of Officer Barham's "punctuality issues and excessive sick leave issues," Officer Barham was "issued a Written Reprimand and . . . suspended without pay for a period of three working days." Unlike Burton, Officer Barham was not required to draft a written memorandum explaining his conduct.

a written explanation of his tardiness, while Officer Barham complied with the request.[6] But Officer Barham was required only to draft a written memorandum on

---

[6]The state defendants also note that Officer Barham never failed to complete an accident report like Burton. But Burton maintains that his failure to timely complete the accident report was not the result of his own inadvertence but instead excusable based on Sergeant Huggs telling him not to prepare the report until Sergeant Huggs could show him how to input the report into the new computer system. Because a genuine issue of material fact exists as to whether Burton's failure to timely complete the accident report was a legitimate basis for his discipline, we decline to consider it in evaluating whether Officer Barham is a valid comparator. In any event, Officer Barham's disciplinary record appears "more serious than that of [Burton]," *see Ridout*, 716 F.3d at 1085, even if we consider Burton's failure to complete the accident report.

For example, Chief Hedden provided Officer Barham with a "memorandum as a form of counseling" regarding an incident in which Officer Barham, as a private citizen but in uniform, went to a neighbor's residence to complain about loud noise. He presented himself "as conducting official business" by stating "open this door right now, it's the police." According to the memorandum, such conduct violated Policy #2004-21, which provides that "[o]fficers shall not intentionally become involved in their own neighborhood quarrels or disputes when off duty." Officer Barham was not disciplined for this conduct. Additionally, on February 6, 2009, a "complaint of Harassing Communications" was filed against Officer Barham. Officer Barham denied following the complainant "for the purpose of videotaping him, but [he] d[id] admit to following [his] wife (Mrs. Barham) for that purpose." Because of a lack of evidence, the complaint against Officer Barham was not sustained. And, on March 17, 2009, Chief Hedden issued a "Letter of Caution" to Officer Barham arising from an incident in Irving, Texas, on January 22, 2009, in which Officer Barham "met and talked with two men in the valet parking area of the Westin Hotel" and was subsequently "approached by two Irving Texas Police Officers that had been called to the hotel." In the letter, Chief Hedden concluded that "the very fact [that] police were called to the location . . . implies that these individuals['] concerns were to the level that they reported you to the police." Officer Barham also admitted "that Irving Police officers were concerned about [him] possibly carrying a weapon and patted [him] down." Chief Hedden stated his belief that Officer Barham failed to "use[] ordinary and reasonable rules of good conduct and behavior in some instances" in accordance with Policy #2004-16(f). The "letter [was] not a form of disciplinary

one occasion, despite the repetitive nature of his conduct. Moreover, "demanding that the compared employees have engaged in precisely identical conduct would make [Officer Barham's] conduct[,] which [we conclude] [is] *more serious* than that of [Burton's conduct,] irrelevant to the analysis." *Ridout*, 716 F.3d at 1085. "[W]e reject such an approach." *Id*. (quotation and citation omitted).

Therefore, we agree with the district court's conclusion that "[t]he comparator evidence, taken together with other record evidence . . ., demonstrates that there is a genuine issue of material fact as to whether there is an inference of discrimination." *Burton*, 2013 WL 598123, at *9. We concur in the district court's determination that, "[v]iewing the evidence in the light most favorable to Mr. Burton, a jury could reasonably find that [the state] defendants' asserted reasons for terminating Mr. Burton were a pretext for race discrimination." *Id*. We thus hold that the district court correctly concluded that Chief Hedden was not entitled to qualified immunity on Burton's § 1983 race discrimination claim.

### 2. *Section 1983 Retaliation Claim*

The state defendants assert that the district court erred in denying Chief Hedden qualified immunity on Burton's § 1983 retaliation claim because (1) Assistant Chief Robinson's conduct cannot be imputed to Chief Hedden, and (2) former Secretary of State Charlie Daniels, not Chief Hedden, made the decision to terminate Burton.

"In complaining of retaliation, [Burton] proceeds under two theories: violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' under 42 U.S.C. § 1983." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 985 (8th Cir. 2011). Under § 704(a) of Title VII, an employer may not "discriminate against any of his

---

action."

employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge [of discrimination] . . . under [Title VII]." 42 U.S.C. § 2000e–3(a). We have previously recognized that "section 704(a) of Title VII 'may not be the basis for a retaliatory discharge claim in a § 1983 action.'" *Tyler*, 628 F.3d at 986 (quoting *Greenwood v. Ross*, 778 F.2d 448, 455 (8th Cir. 1985)). However, "§ 1983 provides a vehicle for redressing claims of retaliation *on the basis of the First Amendment*." *Id.* (emphasis added) (citing *Lewis v. Jacks*, 486 F.3d 1025, 1028–29 (8th Cir. 2007)).

In his complaint, Burton alleges that he "was subjected to the above mentioned acts of retaliation, for having complained about discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964 (as amended) *as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution*." (Emphasis added.) He also asserts that "the above acts of discrimination and retaliation, were committed by the defendant under color of law, making this cause of action enforceable pursuant to 42 U.S.C. § 1983." Nowhere in Burton's complaint does he allege retaliation on the basis of the First Amendment.

We have not yet addressed whether a plaintiff may bring a retaliation claim for complaining of discrimination "under the guise of equal protection" pursuant to § 1983. *See Solum v. Bd. of Cnty. Comm'rs for Cnty. of Houston*, 880 F. Supp. 2d 1008, 1015 n.7 (D. Minn. 2012) ("The Davys allege a First Amendment, freedom from retaliation claim under the guise of equal protection. . . . The Eighth Circuit has yet to address the issue . . . ."). "[B]ut other courts explain that 'claims based on the allegation that [plaintiff] was treated differently in retaliation for his speech are, at their core, free-speech retaliation claims that do not implicate the Equal Protection

-24-

Clause." *Id.* (second alteration in original) (quoting *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 447 (4th Cir. 2004)).[7]

We conclude that the district court "erred in denying [Chief Hedden] qualified immunity on [Burton's] equal protection claim for retaliation [under § 1983]." *Ratliff*, 62 F.3d at 340. "The right to be free from retaliation is clearly established as a *first amendment* right and as a statutory right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation." *Id.* We have only recognized that "§ 1983 provides a vehicle for redressing claims of retaliation *on the basis of the First Amendment*." *Tyler*, 628 F.3d at 986 (emphasis added) (citation omitted). "Because no established right exists under the equal protection clause to be free from retaliation, we reverse the district court's denial of qualified immunity on [Burton's] equal-protection retaliation claim." *Ratliff*, 62 F.3d at 341 (citation omitted).

---

[7]*See also Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) ("The kind of bare retaliation claim at issue in this case simply cannot form the basis for a constitutional equal protection violation."); *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) ("As ISP correctly points out, the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause."); *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause."); *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation . . . ."); *Grossbaum v. Indianapolis–Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996) (stating that the Equal Protection Clause "does not establish a general right to be free from retaliation"); *Ratliff v. DeKalb Cnty.*, 62 F.3d 338, 340 (11th Cir. 1995) (reversing denial of qualified immunity on equal-protection retaliation claim because there is "no clearly established right . . . under the *equal protection* clause to be free from retaliation"); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause.").

## B. *Title VII*

The state defendants also appeal the district court's denial of their summary judgment motion on Burton's Title VII race discrimination and retaliation claims. They request that we exercise pendent jurisdiction over these claims because they are "inextricably intertwined" with the qualified-immunity interlocutory appeal.

"We generally lack jurisdiction 'to hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final decision.'" *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 954 (8th Cir. Aug. 5, 2013) (quoting *Krout v. Goemmer*, 583 F.3d 557, 563–64 (8th Cir. 2009)). Nevertheless, this court "will exercise pendent appeal jurisdiction over such an appeal only in the 'exceptional circumstance' in which it is 'inextricably intertwined' with the qualified immunity appeal, which occurs when the resolution of the qualified immunity claim 'necessarily resolves the pendent claims as well.'" *Id*. (quoting *Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1012 (8th Cir. 2003)).

In the present case, "[o]ur jurisdiction on this appeal is limited to the question of qualified immunity, but the answer to that question necessarily includes a determination whether any constitutional or statutory rights were violated in the first place." *Bankhead v. Knickerehm*, 360 F.3d 839, 843 (8th Cir. 2004) (citing *Lockridge*, 315 F.3d at 1008). "Because [Burton's] Title VII and § . . . 1983 claims set forth parallel, substantially identical, legal theories of recovery, we apply the same analysis to each claim." *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 693 n.3 (8th Cir. 2009) (quotations and citations omitted). "The same *McDonnell Douglas* burden-shifting analysis is applicable to all of [Burton's] discrimination claims, including his Title VII claim against the [state defendants]. *Lockridge*, 315 F.3d at 1013.

Here, "our resolution of the qualified immunity issue" as to Burton's § 1983 race discrimination claim "necessarily resolves" the Title VII race discrimination claim. *Id*. (quotation omitted). Therefore, we conclude that we may exercise pendent jurisdiction over such claim. For the reasons set forth in Part II.A., *supra*, we hold that the district court correctly denied summary judgment to the state defendants on Burton's Title VII race discrimination claim. However, our resolution of the § 1983 retaliation claim against Chief Hedden does not "necessarily resolve" the Title VII retaliation claim against the state defendants. We did not analyze the merits of the § 1983 retaliation claim due to Burton's failure to plead a violation of his First Amendment rights. Therefore, we decline to exercise pendent jurisdiction over the Title VII retaliation claim against the state defendants.

## III. *Conclusion*

Accordingly, we affirm the district court's judgment in all respects, except we reverse its denial of qualified immunity to Chief Hedden on Burton's § 1983 equal-protection retaliation claim. We remand for further proceedings consistent with this opinion.

————————————————